### TELECOM INTERNATIONAL AMERICA, LTD.,
### Plaintiff,

### v.

### AT & T CORP., Defendant.

### AT & T Corp., Counterclaim–Plaintiff,

### v.

### Telecom International America, Ltd. and Telecom International Co., Ltd., Counterclaim–Defendants.

### AT & T Credit Corporation, Third–Party Plaintiff,

### v.

### Telecom International America, Ltd., Third–Party Defendant.

### Telecom International America, Ltd., Fourth–Party Plaintiff,

### v.

### AT & T Corp., Fourth–Party Defendant.

### No. 96 Civ. 1366 AKH.

United States District Court, S.D. New York.

Sept. 27, 1999.

Aurora Cassirer, Jaime L. Weiss, Parker Chapin Flattau & Klimpl, New York City, for Plaintiff–Counterclaim Defendant, Fourth Party Plaintiff Telecom International America, Ltd., and Counterclaim–Defendant Telecom International Co., Ltd.

Alan M. Unger, Elizabeth M. Sacksteder, Sidley & Austin, New York City; Sharon O. Gans, AT & T Corp., Liberty Corner, New Jersey for Defendant–Counterclaim Plaintiff, Fourth–Party Defendant AT & T Corp.

## MEMORANDUM AND ORDER

HELLERSTEIN, District Judge.

Plaintiff and counterclaim-defendant, Telecom International America, Ltd. ("TIA"), a reseller of long-distance "800" services filed suit against defendant and counterclaim-plaintiff, AT & T Corp. ("AT & T"), a provider of telephone equipment and services, alleging breach of contract, fraudulent inducement and violations of the Communications Act. In a Memorandum and Order, dated August 13, 1999, I granted AT & T summary judgment dismissing most of TIA's claims for relief, including TIA's Tenth Claim for Relief alleging unlawful discrimination pursuant to Section 202 of the Communications Act. *Telecom Int'l America, Ltd. v. AT&T Corp.,* 67 F.Supp.2d 189 (S.D.N.Y.1999). Plaintiff now moves pursuant to Rule 37(b) of the Federal Rules of Civil Procedure for an order striking AT & T's answer and counterclaims because of the destruction of certain reports which TIA alleges should have been produced during discovery. In the alternative, TIA requests that I reinstate its Tenth Claim for Relief alleging discriminatory treatment and that an adverse inference against AT & T for discriminating against TIA in the provision of telephone services be drawn. For the reasons stated below, TIA's motion is granted in part.

## Background

TIA and AT & T are parties to three agreements: a contract tariff order for the purchase of AT & T telephone services executed in April 1994, and two equipment contracts executed in April 1994 and June 1995, detailing the equipment purchased by TIA from AT & T. Through the purchase of the equipment and telephone services, TIA proposed to provide international "800" long-distance services to subscribers in Japan at rates lower than the international rates provided by Japanese telephone companies. However, TIA's product, activated on June 16, 1994, called "Diamond Net," encountered numerous performance problems which caused TIA to fail to meet certain minimum volume commitments. In February 1996, TIA filed suit against AT & T seeking damages for breach of contract, fraudulent inducement and other quasi-contract remedies. In August 1998, TIA amended its Complaint to add claims for discrimination, unfair and unlawful practices under the Communications Act and unfair competition under federal and state law. TIA's Tenth Claim for Relief, claiming unlawful discrimination under Section 202 of the Communications Act, alleges that AT & T provided TIA with inferior service as compared to other similarly situated customers. After TIA filed suit, AT & T then filed counterclaims—TIA's failure to meet the prescribed minimum volume commitments prompted AT & T to claim that it was entitled to recover all unpaid balances and for the substantial discount in rates that had been charged to TIA pursuant to the contract tariff filed with the Federal Communications Commission, Contract Tariff No. 1192.

After the close of discovery, AT & T moved for summary judgment seeking to dismiss all of TIA's claims against it and for summary judgment on its four counterclaims against TIA, seeking the payment of unpaid balances for services provided and for the payment of shortfall charges incurred due to TIA's failure to reach the minimum volume commitments in Contract Tariff No. 1192. Oral argument was held on AT & T's motion for partial summary judgment on March 18, 1999, and continued on June 11, 1999. I informally ruled on various parts of the motion directly following argument, and issued my decision in the Memorandum and Order dated August 13, 1999. Of relevance here, I found that TIA had failed to present any facts showing unlawful discrimination, and I thus ordered the dismissal of its Tenth Claim for Relief.

Prior to the second oral argument, but after having fully briefed the summary judgment motion, TIA filed a separate "cross-motion" seeking an order pursuant to Rule 56(f) of the Federal Rules of Civil Procedure continuing AT & T's summary judgment motion until TLA could conduct further discovery. Specifically, TIA sought the production of reports generated by AT & T's International Transit Accounting and Maintenance Analysis of Calls ("ITAMAC") System.[1] The ITAMAC data for international calls consists of "call detail information recorded by AT & T's network switches with respect to every international call received by AT & T's switches." (Affidavit of Susan J. Robinson, dated July 29, 1999 ("Robinson Aff."), at ¶ 2). The information is processed and stored on the ITAMAC database, and reports (the "ITAMAC Reports") can be generated from the database. (Id.). These are the reports which TIA seeks.

TIA believes that the ITAMAC Reports would show that a large and disproportionate percentage of TIA's calls originating in Japan were transmitted by AT & T and KDD (a Japanese telephone provider) via satellite rather than via cable transmission, and that satellite transmissions are of poorer quality than cable transmissions. (Affirmation of Aurora Cassirer, dated August 6, 1999 ("Cassirer Aff."), at ¶ 16). TIA argues that AT & T violated Section 202 because of this alleged discrimination. I denied TIA's Rule 56(f) motion, ruling that the ITAMAC Reports should have been discovered during the 18 months of discovery conducted in this matter, and because counsel for TIA had represented to Judge Mukasey, in connection with TIA's amendment to its Complaint in August 1998,

---

1. Throughout the papers, the reports generated by the ITAMAC System are also referred to as the "ITAMIC" Reports. The parties appear to use the acronyms interchangeably.

that the new claims for relief would not require new discovery.[2]

By motion dated June 21, 1999, TIA moved for reconsideration on the ground that the ITAMAC Reports would show a pattern of discrimination in the delivery of services by AT & T to TIA. In an order dated July 2, 1999, I granted reconsideration to the extent of ordering AT & T to produce ITAMAC Reports for a sample period, to permit counsel to argue, and for me to decide, if further reconsideration should be had of my dismissal order of August 13, 1999. I suggested the three months between September 1, 1994 through November 30, 1994, for the sample period, subject to agreement or suggestion of counsel for an alternative sample period.[3] Following the conference at which this was discussed, AT & T submitted an affidavit representing that the ITAMAC reports for 1994 and 1995 had been destroyed and, consequently, no relevant reports could be produced to TIA. (Robinson Aff., at ¶ 7). This motion ensued.

### TIA's Requests for the Production of the ITAMAC Reports

TIA argues that it first requested the ITAMAC Reports at the inception of this litigation in 1996 when it submitted its Second Request for Documents, and additionally in correspondence exchanged by the parties during the course of discovery. TIA contends that the ITAMAC Reports were responsive to its specific document requests, and that AT & T employees testified during depositions that the ITAMAC Reports were helpful tools utilized by AT & T when it analyzed Diamond Net's performance problems.

Specifically, TIA asserts that the ITAMAC Reports were responsive to three requests in their Second Document Request dated February 28, 1996:[4]

> 19. Any documents concerning and/or otherwise supporting the statements

"KDD routes approximately 80%–90% of calls to the U.S. via cable ... KDD does not have the capability to track specific calls from specific companies across its network or across international cables" as excerpted from Exhibit G hereto, a letter produced by AT & T in this litigation at Bates No. A02264.

. . .

> 25. Any documents concerning "a case to document that TIA's success/failure rate is no different than other turnaround users" as referred to in Exhibit J hereto, a handwritten document produced by AT & T in this litigation at Bates No. A03076.

> 26. Any documents, including without limitation, test results, reports, specific action recommendations, studies, memoranda, correspondence, analyses and/or conclusions concerning the issues outlined in Daniel Ethe's letter, dated May 22, 1995, and/or Jacques Richard's and Daniel Ethe's letter, dated June 21, 1995, copies of which are annexed [to the document request].

(Cassirer Aff., at Ex. 1). In addition, TIA also points to a letter from predecessor counsel to counsel for AT & T, dated September 27, 1996 (the "September 27, 1996 Letter"), where TIA's counsel requested:

> 6. All ITAMIC reports for calls made on, through, or over either leg of Diamond Net (responsive to Second Document Request No. 8, 9, 10, 19, 25, 26).

(Cassirer Aff., at Ex. 3). TIA contends that AT & T produced but a small fraction of ITAMAC Reports—that which AT & T claims to have found in the personal files of several of its employees, and which, according to AT & T, it produced "voluntarily." In support of its argument for sanctions, TIA

---

**2.** Judge Mukasey had presided over this matter before it was assigned to me on December 29, 1998.

**3.** During the conference with the Court, TIA requested modification of the dates for a sample of ITAMAC Reports, and counsel for AT & T agreed to look for the relevant ITAMAC Reports.

**4.** The parties dispute the date TIA served this request upon AT & T. TIA contends it was served in February 1996, while AT & T's records allegedly show that the document request was served some time in May 1996. The difference in dates is not relevant to this dispute.

argues that the remarks in deposition testimony of an AT & T employee should be understood as admissions that two-thirds of TIA's calls were transmitted via satellite rather than cable, and that the ITAMAC Reports would support this admission.

TIA's reference is to the notes of a conference call written by Philip Collura, a member of AT & T's task force organized to study the problems encountered by Diamond Net. Mr. Collura wrote, in reference to TIA's experience:

ITAMIC—2/3's of calls on satellite INBOUND

. . .

[Dan] Ethehe looked at 24 HR ITAMIC— high % was satellite

(Supplemental Affidavit of Eamon F. Joyce, dated May 27, 1999, Ex. D). During his deposition, however, Mr. Collura denied having any recollection of "specific [conference] calls." (*Id.* at Ex. E). Mr. Collura testified that he had a general recollection that Dan Ethe, another AT & T employee assigned to the task force, noted during a conference call that Mr. Ethe had looked at the ITAMAC reports and concluded that a "high percentage" of TIA's calls were carried over satellite. (*Id.*).

TIA requests that I strike AT & T's answer and counterclaims. In the alternative, TIA requests that I reinstate its Tenth Claim for Relief alleging unjust and discriminatory treatment and that an adverse inference against AT & T for discriminating against TIA be drawn. TIA's point is that AT & T prevented it from proving discrimination by destroying the proof.

AT & T counters by stating that it produced over 400 pages of ITAMAC Reports, generated while AT & T attempted to improve Diamond Net's performance problems, and that these adequately show that there was no discrimination. AT & T asserts that it first produced 39 pages of the ITAMAC Reports because those reports were located in the files of witnesses for the preliminary injunction hearing held at the inception of this matter. AT & T later produced an additional 319 pages of ITAMAC Reports in response to TIA's Second Document Request, because they were "found in the files

of AT & T personnel." (Affidavit of Alan Unger, dated September 1, 1999 ("Unger Aff."), at ¶ 9). Finally AT & T states that it produced a "further 61 pages of ITAMAC reports generated" in May and June 1995, without indicating why, or in response to what, such documents were produced. (*Id.* at ¶ 12).

According to AT & T, these ITAMAC Reports, constitute all of the reports "generated and reviewed in the course of AT & T's dealings with TIA and [ ] maintained in . . . hard copy." (Unger Aff., at ¶ 9). AT & T contends that it did not conduct any further searches because "no reasonable person" would have understood TIA's document requests, because of their vagueness and imprecision, to call for the production of ITAMAC Reports. AT & T further notes that it filed objections to Request Nos. 19, 25 and 26, that TIA never moved to compel the production of documents, and that AT & T objected to TIA's specific request for the ITAMAC Reports in the September 27, 1996 Letter because it was beyond the scope of the Second Document Request. AT & T argues that TIA should have moved to strike AT & T's objections and to compel production, if it truly believed that additional pages of the ITAMAC Report would show that AT & T had discriminated against TIA in the quality of the service it furnished under Contract Tariff No. 1192.

In addition, AT & T claims that it alerted counsel for TIA, by letter dated November 25, 1996, that ITAMAC records are regularly destroyed "because of the vast number of records involved . . . within several days of origination of the records." (Cassirer Aff., at Ex. 9). However, this is apparently not the case, for three years later, the same counsel for AT & T wrote that the records are retained in back-up forms for "approximately one year":

AT & T maintains ITAMIC data in two forms, each of which is subject to different retention periods. AT & T generally maintains ITAMIC data for two weeks (the current and preceding week) in an AT & T database. At the end of each week, the data for the preceding week are rou-

tinely purged. Once purged from the database, the storage is overwritten with more current data. To the best of AT & T's knowledge, the purged information is irretrievable. In addition, AT & T creates a back-up tape of the ITAMIC data stored in the database. The tapes are maintained for a period of approximately one year, after which the data is routinely purged. The purged tapes are reused to store data and to the best of AT & T's knowledge, there is no means of retrieving the data after they have been purged from the tape. (Cassirer Aff., at Ex. 10). An AT & T employee who was responsible for the ITAMAC system during 1994–1996, the years of Diamond Net's operation, confirmed that AT & T retained such backups for one year. (Robinson Aff., at ¶ 5). If this was the case, AT & T could have produced records responsive to TIA's document requests.

On the merits, AT & T argues that the ITAMAC Reports that were produced demonstrate that 99.2% of TIA's calls were routed via cable and not over satellite, thus disproving TIA's claim that "two-thirds" of TIA's calls were transmitted over satellite.[5] (*Id.* at ¶ 13). Moreover, AT & T contends that the production of more ITAMAC Reports would not have cured the inadequacy of TIA's proofs in showing discrimination. (*Id.* at ¶ 22).

### Discussion

▮ Generally, there is no duty to preserve evidence or documents unless a party possessing the evidence has notice of its relevance. Usually such notice is provided when suit has been filed, "providing the party responsible for destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation." *Kronisch v. U.S.*, 150 F.3d 112, 126 (2d Cir.1998); *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 73 (S.D.N.Y.1991) ("*Turner*"). Clearly, a party is also put on notice when an opponent has made a specific document request. *Turner*, 142 F.R.D. at 73. Once on notice, the obli-

gation to preserve evidence runs first to counsel, who then has a duty to advise and explain to the client its obligations to retain pertinent documents that may be relevant to the litigation. *Kansas–Nebraska Natural Gas Co. v. Marathon Oil Co.*, 109 F.R.D. 12, 18 (D.Neb.1983).

▮ Courts have the authority to sanction a party that destroys relevant and discoverable evidence. Fed.R.Civ.P. 37(b). Even without a specific discovery order, a district court may impose sanctions for spoliation of evidence, exercising its inherent power to supervise the litigation before it. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999) ("*Goodyear*"). District courts have broad discretion in crafting an appropriate sanction for the spoliation or destruction of evidence. *Goodyear*, 167 F.3d at 779.

▮ The Second Circuit has instructed that any sanction issued by a district court should be designed to:

(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore "the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." (citations omitted).

*Goodyear*, 167 F.3d at 779. Although outright dismissal is ·an available sanction, the Second Circuit has held that it is a "drastic remedy" and should "be imposed only in extreme circumstances, usually after consideration of alternative less drastic sanctions." *Id.* Generally, dismissal may be appropriate when a party demonstrates "willfulness, bad faith, or fault on the part of the sanctioned party." *Id.*

▮ AT & T's response to TIA's discovery requests for the ITAMAC Reports, and ultimate destruction of those reports, demonstrate an indifference to its discovery obligations. The ITAMAC Reports were fairly

---

**5.** TIA disputes the reliability of this figure, because some of the produced ITAMAC Reports consist of "simulated" calls and because one of the ITAMAC Reports tracks only one of TIA's three trunk lines. (Reply Affirmation of Aurora Cassirer, dated September 3, 1999, at ¶ 3 n. 1).

requested by TIA at least twice during 1996, and clearly and specifically in the September 27, 1996 Letter. AT & T's objection to production does not justify a destruction of the documents withheld from production. Nor is destruction justified by TIA's failure to move for production under Rule 37(a) of the Federal Rules of Civil Procedure, especially when counsel for AT & T misled TIA into believing that the relevant records had already been destroyed in the regular course of business. AT & T cannot blame a party for failing to move for production of documents that AT & T had represented did not exist.

The ITAMAC Reports show whether TIA's calls were routed via cable or via satellite. The record shows that AT & T's employees referred to ITAMAC Reports in connection with their analysis of the performance problems encountered by TIA with respect to the equipment and telephone services sold by AT & T to TIA. Even though TIA's unlawful discrimination claim for relief was not filed until 1998, the ITAMAC Reports were requested earlier, during the period when AT & T could have produced ITAMAC Reports for much of the time Diamond Net was in operation, and in relation to TIA's claim that the equipment sold by AT & T to TIA could not automatically connect separate legs of the calls transmitted via Diamond Net. Whether or not the mode of transmission—cable versus satellite—might affect the quality of transmission using the equipment is not now the issue. The issue is whether or not AT & T prevented TIA from proving its contention by destroying the records that TIA needed to evaluate its contentions and, if and to the extent appropriate, present as proofs. AT & T had notice of the potential relevance of the ITAMAC Reports to the claims in this action in 1996, especially those concerning TIA's calls, and AT & T should have taken appropriate measures to insure that such reports would not be destroyed.

There is no evidence, however, to support a claim that AT & T's conduct was willful, in the sense that it was deliberate or done in purposeful bad faith. It would be excessive to strike AT & T's answer and counterclaims, or to grant TIA judgment by default with respect to TIA's Tenth Claim for Relief. But, an appropriate sanction is necessary; relevant information was denied to TIA, and if that evidence would reasonably support a finding of discrimination, an appropriate inference should be available to TIA.

I am unable, on the record presented to me, to decide if the missing ITAMAC Reports could prove a case of discrimination. A hearing of expert testimony is necessary for me to determine what, if any, inferences may be drawn from the missing evidence. *See, Turner,* 142 F.R.D. at 76 (a "nexus between the proposed inference and the information contained in the lost evidence" must be demonstrated).

By my Memorandum and Order of August 13, 1999, the parties were instructed to appear for a pre-trial conference set for September 30, 1999, at 5:00 p.m., in Courtroom 14D, United States Courthouse, 500 Pearl Street, New York, New York, to discuss experts' proofs for other issues in this case. During the conference, the parties should be prepared to discuss the parameters of the hearing required pursuant to this Memorandum and Order, including: whether the ITAMAC Reports produced during the course of the litigation provide a statistically reliable sample to allow inferences to be drawn from that which has been produced; the extent of an inference of discrimination that can be drawn from the ITAMAC Reports; the implications, if any, of the routing via satellite or cable in connection with how the services and equipment worked together; the availability of preferred routing at the time of contract execution; and other such related issues. I leave open the issue of reconsidering my dismissal of TIA's Tenth Claim for Relief alleging unlawful discrimination, as ordered by my Memorandum and Order dated August 13, 1999. As to the costs of this hearing, since it is made necessary by AT & T's destruction of relevant evidence, I will consider, after the hearing, imposing the costs and expenses of such, including some or all of TIA's legal fees, on AT & T.

SO ORDERED.