**In the Matter of the Complaint of Robert I. WECHSLER, Owner of the Motor Vessel ATLAS, for Exoneration from or Limitation of Liability.**

No. Civ.A. 97–264.

United States District Court,
D. Delaware.

Dated: Oct. 20, 2000.

Amended: Nov. 14, 2000.

Michael B. McCauley, Palmer, Biezup & Henderson LLP, Wilmington, Delaware, for petitioner, Robert I. Wechsler.

William J. Cattie, Cattie & Fruehauff, Wilmington, Delaware, of counsel, Carter B.S. Furr, McGuire, Woods, Battle & Boothe LLP, Norfolk, Virginia, J. Paul Mullen, Kathleen M. Bustraan, Lord & Whip P.A., Baltimore, Maryland, for claimant Georgetown Yacht Basin, Inc.

John D. Balaguer, White & Williams LLP, Wilmington, Delaware, of counsel, Edgar A. Jaeger, Jr., White & Williams LLP, Philadelphia, Pennsylvania, for claimants George and Jacqueline Axilbund, Federal Insurance Company, American Eagle Group, Inc., Royal Insurance Company, Bateau, Inc., and Tracy's Miracle Corp.

Raymond W. Cobb, Raymond W. Cobb LLC, Wilmington, Delaware, of counsel, George N. Styliades, Cherry Hill, New Jersey, for claimants Edward R. Dudlik, Sr. and The St. Paul Fire and Marine Insurance Company.

Carl N. Kunz, III, Murphy, Spadaro & Landon, Wilmington, Delaware, of counsel, Alfred J. Will, Badiak, Will & Ruddy, LLP, New York City, for claimant Great American Insurance Company.

Lee C. Goldstein, Lee C. Goldstein, Wilmington, Delaware, of counsel, Faustino Mattioni, Stephen J. Galati, Mattioni, Ltd., Philadelphia, Pennsylvania, for claimants

Sandra J. Larsen, Sandlar Corp., and James and Steven DePaul.

## AMENDED OPINION

SLEET, District Judge.

## I. INTRODUCTION.

Robert I. Wechsler once owned a vessel named the ATLAS. On November 23, 1996, this ship caught fire while it was docked at the Georgetown Yacht Basin. The fire damaged a portion of the dock and destroyed several of the surrounding boats. The resulting losses are estimated at over $1 million. Wechsler subsequently filed an action in admiralty with this court to limit his liability to cost of the only salvageable item left from the ATLAS after the fire—a brass propeller worth approximately $500. *See* 46 App. U.S.C.A. § 181 *et seq.* (West Supp.2000).

Several of the claimants have filed motions for sanctions as a result of certain actions taken by Wechsler in the aftermath of the fire. In their submissions, they essentially argue that Wechsler's lawsuit should be dismissed and, as a consequence, the cap on his liability removed because he failed to preserve (if not intentionally destroyed) the ATLAS. In opposition, Wechsler argues that these claimants had an opportunity to preserve the vessel when the ship was raised but declined to do so. Wechsler further contends that the ATLAS was preserved for a sufficiently lengthy period of time to allow all of the interested parties to conduct an appropriate inspection.

Wechsler has also moved for summary judgment. In his motion, he argues that no party has been able to introduce sufficient evidentiary support for their claims that the fire started onboard the ATLAS. This inability, ironically, appears to be due in large part to the destruction of the vessel. Finally, the Georgetown Yacht Basin has moved for summary judgment on the claims for negligence, breach of contract and common law bailment which Wechsler and another boat owner have brought against the marina.

After considering these submissions in light of the governing law, the court has decided to impose a dispositive sanction against Wechsler for his destruction of the ATLAS. Given the record evidence, the court concludes that the vessel was destroyed in an attempt to prevent the claimants from conducting further inspections of the remains and, thus, possibly determining the cause and origin of the fire. Because the disposal of the ATLAS has substantially prejudiced the claimants by preventing them from establishing their claims, a dispositive sanction is necessary to not only punish Wechsler for his culpable conduct but also deter others from engaging in similar misconduct in the future. In light of this ruling, Wechsler's motion for summary judgment will be denied as moot. Finally, the court will grant Georgetown's motion for summary judgment because the exculpatory language contained within its slip rental agreement absolves the marina from any liability due to its negligence. In addition, given the unrestricted access which was afforded to the owners of the two vessels in question, the court cannot conclude that they were bailed articles. The following sections explain the basis for these rulings in greater detail.

## II. BACKGROUND.

Built in 1964, the ATLAS was a fifty-seven foot wooden yacht. At the time of the fire, Wechsler was storing the vessel at the Georgetown Yacht Basin. He rarely used the boat after having moved to Florida. In fact, for the two years which preceded the fire, Wechsler had been trying to sell the ship and had only been onboard it twice. During this time, it seems that any maintenance on the vessel was performed by Skipjack Cove Marina.

### A. The Condition Of The ATLAS Before The Fire.

Insurance records from the relevant time period show that the ATLAS was not

in peak condition. For example, a 1987 survey found that "the electrics, wiring, and systems were in a very poor condition" and did not comply with National Fire Protection Association ("NFPA") standards. A 1991 survey reached a similar conclusion, finding that the battery terminals were not clean and that there was loose and obsolete wiring throughout the vessel. This survey also recommended that ground fault breakers should be installed in several outlets and that all circuits should be protected by fuses or breakers so that the ATLAS could come into compliance with the standards annunciated by the American Boat and Yacht Council ("ABYC"). Given the general condition of the ATLAS and its electrical system in particular, the 1991 survey concluded that the vessel was not a good insurance risk. In 1993, another survey was conducted. It reached the same conclusion concerning the electrical system. Among other things, this survey found that:

> the AC [alternating current] power supply for the air conditioner water pump has been spliced without a junction box using twist-on wire connectors and the pump has lost its grounding connection; there is an ungrounded AC receptacle inside the forward hanging locker on the starboard side of the main cabin along with an AC receptacle which has been removed from its mounting box and left unsecured; a two conductor lamp cord has been wired into this receptacle and also one in the midship guest cabin receptacle; light gauge AC power feed wires have been improperly installed on the main AC feeder cables inside the AC distribution box; the AC grounding has been connected to the AC neutral side of the hot water heater breaker box. . . .

> The DC [direct current] wiring has numerous unsecured and improperly routed wires under the flybridge console and in the engine compartment. There are some unhooked and abandoned wires. There has been a[n] unfused 12

volt power supply improperly tapped into the center bank of batteries.

Based on these findings, the 1993 survey concluded that "[t]he vessel should be attended to by a qualified marine electrician knowledgeable of proper marine wiring practices and ABYC standards." The report further explained that both the AC and DC wiring "should have [the] necessary revisions and repairs made in order to bring the vessel's wiring to current ABYC standards."

All these surveys show that, prior to the fire, there were several problems with the AC and DC electrical systems onboard the ATLAS. The insurance inspectors concluded that these systems fell below the applicable safety standards which governed in this particular area. These inspectors also found that several repairs to the ATLAS needed to be made before it could be considered a "good marine [insurance] risk."

Despite these findings, it appears that Wechsler did not ask Skipjack to perform any electrical work on the vessel. While Wechsler claims that these problems were in fact corrected, none of Skipjack's work orders or invoices contain any mention of anyone performing any work on the electrical systems onboard the ATLAS. Although Wechsler claims that Skipjack's records from this time are incomplete, he has not produced any canceled checks or receipts from any repair service which show that the work was actually completed.

Nevertheless, during discovery, a letter dated August 25, 1994 was produced by Wechsler. The letter was seemingly authored by the individual who conducted the 1993 survey of the ATLAS on behalf of Wechsler's insurance company (Windsor–Mount Joy). It appeared to confirm that the necessary repairs had in fact been made to the vessel's electrical system. This one-sentence letter stated that "the recommendations addressed in the . . . 1993 survey have been completed."

On March 10, 1998, the surveyor who supposedly wrote the August 25th letter (Woodrow W. Loller) was deposed. He testified that, at Wechsler's request, he conducted a survey of the ATLAS in August of 1994 and found that "the problems [mentioned in the 1993 survey] had been corrected." Loller also testified that he spent three hours on board the vessel making these verifications. He further stated that he was alone while he conducted his inspection. Finally, while still under oath, Loller testified that he had summarized his conclusions in the August 25, 1994 letter which he sent to Wechsler.

Thus, even though there were no billing records or other notes in Loller's files to support his claim that he actually visited the ATLAS in August of 1994 and even though there were no photographs or reports which documented the findings that he made during his inspection, Loller remained steadfast in his claim that he actually inspected the vessel and found that the recommended repairs had been made. However, one day after his deposition, Loller recanted large portions of this testimony.

After having had the opportunity to confer with Wechsler's legal counsel and Harold Mountz, the manager of Windsor–Mount Joy's maritime insurance division, Loller submitted an errata sheet which corrected several "errors" in his earlier testimony. For example, Loller explained that, upon further examination of the August 25th letter, he was able to determine that neither he nor anyone under his control created or produced the document. As Loller himself wrote, the letter "was produced without [his] knowledge or authorization." In fact, he called the letter a "forgery."

Given the dramatic change in his testimony, Loller's deposition was reconvened. Upon further questioning, Loller stated that contrary to his earlier testimony, Wechsler was not the one who had requested the follow-up survey of the ATLAS in 1994. Instead, Loller stated, it was Mountz who made this request. Loller also stated that he first saw the August 25th letter in the Spring of 1997 when it was faxed to him by someone at Windsor–Mount Joy. According to Loller, the letter was sent to him in an attempt to jog his memory concerning events so that he would sign an affidavit which stated that he had "later inspected the ... ATLAS ... and confirmed that all of the electrical deficiencies noted in [his] report of July 7, 1993 had been completely and competently corrected."

Despite all of these inconsistencies in his recollection and explanation of events, Loller remained confident that he did in fact conduct a subsequent inspection of the ATLAS in 1994. Specifically, Loller testified that Mountz asked him to re-inspect the vessel. Loller also testified that Mountz told him that he did not have to prepare a written report or, for that matter, even send a letter which confirmed that this inspection had been completed and that all of the necessary repairs had been made. Instead, Loller claims, he merely communicated these findings to Mountz during a telephone conversation which occurred at some unspecified time. The court, however, has not been provided with any telephone logs or other records which would indicate that this conversation actually took place. In addition, Wechsler has not introduced any records or notes of any kind which recount the topic of this supposed conversation.

Thus, save for one letter which was admittedly "forged," there is no documentary or other corroborating evidence to support the assertion that Loller inspected the ATLAS in 1994. There are no billing records, receipts or notations of any kind to suggest that Loller boarded the vessel and verified that the numerous electrical problems which he noted in 1993 had been corrected. Instead, on this point, there is only the testimony of Loller himself which is at best inconsistent.

Therefore, it is distinctly possible that Loller did not inspect the ATLAS in 1994. Of course, if he did not actually inspect the vessel, then he could not have confirmed that the necessary repairs had been made. As a result, it is quite possible that the electrical problems which were recounted in 1987, 1991 and 1993 surveys were never corrected.

As mentioned earlier, there is no independent corroborating evidence which shows that any repairs to the electrical system were made. Wechsler has not submitted any bills or receipts from any repair service which might have made these repairs. Nor has he introduced any canceled checks to show that a repair bill was actually paid. In fact, despite the voluminous discovery which has occurred in this case, Wechsler has not even been able to identify the person who allegedly repaired the problems with the ship's electrical system. Thus, the only support which Wechsler has for his contention that the needed electrical repairs were in fact made is Loller's testimony which, as previously explained, is highly questionable.

Furthermore, with the destruction of the ATLAS, it is not possible for the claimants to now prove that the electrical problems which were noted in the 1987, 1991, and 1993 surveys were not corrected. Instead, the claimants can only posit that the repairs were not made given the circumstances surrounding the August 25th letter, the significant change in Loller's testimony and the lack of any corroborating evidence to suggest that the electrical problems were in fact corrected.

B. The Raising Of The Atlas After The Fire.

As mentioned earlier, the ATLAS caught fire during the early morning hours of November 23, 1996. Although it is not exactly clear how this fire started, several of the claimants suspect that the blaze was caused by the vessel's electrical system. Before the ATLAS could be towed from the dock, the fire spread to two neighboring vessels—the JACE and the SWAN SONG. Like the ATLAS, these two boats also burned to their waterlines, rendering them unsalvageable. However, unlike the ATLAS, it does not appear as if these vessels sank to the bottom of the river after having been gutted by the fire.

The dock itself even caught fire that night, along with at least six other ships in surrounding slips. In particular, the HOPE SO TOO, the MIMA IV, the JANIE–D, the TOY YOT, the SAND LAR, the ENTOURAGE and the SIX REASONS were all damaged in the fire, although not as severely as the ATLAS, JACE, and SWAN SONG. The damage to Georgetown's dock has been estimated to be in excess of $400,000.

By the time that the smoke had cleared, the insurance underwriters for the ATLAS, the JACE, the SWAN SONG and Georgetown had retained investigators, surveyors, and other experts to assess the overall damage caused by the fire and to determine the fire's cause and origin. These insurance companies were Windsor–Mount Joy for the ATLAS, American Eagle for the JACE, Chubb for the SWAN SONG, and Reliance for Georgetown.

Recognizing that their vessels had to be removed from the navigable waterways because they were creating an environmental hazard by leaking diesel fuel, the ATLAS, JACE, and SWAN SONG interests agreed to retain a marine salvor. They also agreed that Catherine McLaughlin of Windsor–Mount Joy would be responsible for hiring the salvor. She would also serve as the salvor's sole point of contact for the salvage operation.

McLaughlin then retained a marine salvage company by the name of Martin G. Imbach, Inc. The company itself was run by Manus E. McGeady. He had over thirty years of experience as a marine salvor and would supervise the salvage operation personally. The operation itself was scheduled to commence on November 30, 1996. First, the ATLAS would be raised.

Then, it would be removed along with the JACE and the SWAN SONG.

According to Georgetown, four days before the operation was scheduled to commence, a dispute arose over whether the parties would be able to conduct a joint survey of the ATLAS after it had been raised. Although it appears that McLaughlin was initially against the idea, it seems that she eventually relented in the face of several letters which Georgetown's counsel had sent to her and Mountz. One of these letters stated, *inter alia*, that:

> [J]oint surveys are customary in marine cases. . . . Courts have held that if a party refuses to permit a joint survey, then such a refusal is done at the party's own risk and peril. . . . [S]uch a refusal may ultimately prejudice a party's position in subsequent litigation.

A subsequent letter informed McLaughlin and Mountz that Georgetown was "concerned about the spoliation of evidence" and was, therefore, "reiterat[ing its] request for a joint survey." Ultimately, McLaughlin and Mountz capitulated.

On November 29, 1996, six days after the fire and one day before the salvage operation was set to commence, representatives on behalf of the ATLAS, JACE, and SWAN SONG interests along with Georgetown met at the dock to review how the ATLAS would be raised. During this meeting, McGeady stated that he intended to place two slings under the keel of the ATLAS at opposite ends of the vessel.[1] He would then use a floating crane to lift the vessel out of the water. According to McGeady, this way was the "most reasonable and efficient method available to try to raise the ATLAS intact" to the surface of the water.

However, McGeady then went on to say that if the vessel were raised in this manner, it might break apart upon reaching the surface of the water. Apparently, the divers who had attached the lifting straps to the ship had observed that its hull had been severely burned during the fire. As a result, the structural integrity of the vessel was highly questionable. Thus, once the ATLAS cleared the surface of the water and the full weight of the vessel was displaced along the weakened hull, it was quite likely that the ship would snap in two. Nevertheless, all of the representatives who were present at the scene do not appear to have objected when McGeady recommended using two slings to raise the ATLAS.

The following day, the ATLAS was raised. Again, representatives on behalf of all the interested claimants were present. When they first arrived on the scene, they noticed that McLaughlin had stretched a length of yellow tape across the dock. As she stood in front of it, she initially told the others that they would have to stay behind the line until she and the Maryland Deputy Fire Marshall conducted their inspection of the ATLAS.

After the ATLAS had been partially lifted out of the water, the operation was briefly halted so that the investigators, surveyors and other experts could videotape and photograph the vessel. However, no one was allowed on board the yacht because the Deputy Fire Marshal was concerned that it might break apart given the weakened condition of the hull.[2]

---

1. It seems that McGeady and McLaughlin had previously discussed a less expensive method of using a "clam shell bucket" to scoop the ATLAS off the bottom of the slip piece by piece. McLaughlin seems to have rejected this approach since there was no chance that it would leave the vessel intact.

2. Thus, even though McLaughlin was willing to allow the other surveyors on board the ATLAS and conduct their inspections, the court does not conclude that her offer provided any of the claimants or their representatives with a meaningful opportunity to conduct a physical examination of the vessel. It would appear that only the Deputy Fire Marshall actually boarded the yacht. After doing so, he determined that the ATLAS was not structurally sound. He, therefore, prohibited the other interests from inspecting the vessel out of a concern for their personal safety. In this respect, no party had a meaningful op-

During this time, Georgetown's surveyor (Stephen Mason) expressed a concern that was apparently echoed by some (if not all) of the others present. Specifically, if the operation was going to continue and the ATLAS was going to be lifted out of the water, then (as even Wechsler himself has conceded) the vessel "would very likely . . . break apart since the hull and keel were severely burned and lacked the internal integrity to stay intact when raised all the way out of the water."

At this point in time, the parties apparently discussed how to best proceed with the operation. McGeady asked whether the vessel should be raised for forensic value or for disposal as wreckage. In response, McLaughlin apparently told McGeady that she wanted the wreck removed for the purposes of disposal. The remainder of the parties, however, seem to have told the salvor that the vessel should be raised intact to preserve its forensic value because, without a complete vessel, it would be extremely difficult (if not impossible) to determine the cause of the fire.

McGeady then informed them that while he could accomplish this task, he would have to lower the vessel back into the water and bring in a team of divers to construct a wooden cradle or brace underneath the boat. As a result, the salvage operation would be delayed at least another two to three days. Also, the cost of raising the ATLAS would increase dramatically. According to McLaughlin, "the expense would have been outrageous."

McLaughlin informed the others who were present that Windsor–Mount Joy would not pay for these additional costs. Nevertheless, she did invite the other interests to pay for the cradle. No one on the scene, however, was willing to cover this expense. Nor did anyone suggest

splitting the cost among all of the interested parties.

In apparent response to McLaughlin's proposal, Chubb's surveyor (Robert Gunther) pointed out that one of Imbach's divers was still on the scene. He could easily slip back into the water and attach additional lifting straps to the ATLAS which might be sufficient to support the weight of the boat as it was lifted out of the water. Apparently, the task would take no more than two or three hours, adding little to Imbach's bill. Mason then recommended that if nothing else, the diver could attach a third strap around the middle of the boat which would take no more than an hour to complete.

Again, in response to these suggestions, McLaughlin stated that if Chubb, Reliance, or any of the other underwriters were willing to pay the additional costs of these proposed methods, then they were free to do so. Windsor–Mount Joy, however, would not be footing this portion of the bill. During these remarks, McLaughlin may have made a comment along the following lines: And, if the vessel breaks apart into a million pieces, then Windsor–Mount Joy will be in a better defensive position in any subsequent litigation since, without an intact vessel, it will be very difficult to prove negligence.[3]

In any event, it does not appear as if any of the other representatives took McLaughlin up on her offer. There is no evidence in the record to suggest that any one of these individuals was willing to pay for the additional costs of raising the ATLAS in a manner that would better ensure its preservation. Instead, the record demonstrates that all of these representatives refused to cover these additional costs either individually or collectively. For example, the representative for the JACE

portunity to conduct a physical inspection of the ATLAS at the time that the vessel was raised.

3. Although McLaughlin has denied making such a statement, both Mason and Gunther recall her saying words to this effect. To the

extent that she may have said something along these lines, McLaughlin claims that her comment was made only in jest given the "quips" which some of the investigators were exchanging during the recovery operation.

interests has testified that he "would have preferred to have ... the remains ... brought up intact." He, however, "wasn't going to spend [his] own money" to do it. Georgetown's representative also did not volunteer to pay the additional costs because, in his client's view, it "wasn't [the marina's] obligation to be financially responsible for the raising of the vessel, the preserving of the vessel or anything of that nature." In this respect, even though the parties might not have expressly consented to the method by which the ATLAS was raised, none of them were actually willing to incur the additional costs associated with raising the vessel in a manner which was more likely to preserve the integrity of the hull. Thus, while the claimants may have grudgingly accepted the use of the two-sling method, the record makes it clear that they were nonetheless willing to accept this method even though it might lead to the destruction of the vessel.

The operation to raise the ATLAS then resumed. Upon clearing the water, the vessel predictably collapsed under its own weight. Apparently, the slings cut into the charred wood of the hull. As the ATLAS was raised higher out of the water, the slings dug deeper into the vessel. Ultimately, the ship broke into two or three pieces, dumping a tremendous amount of charred wreckage and burned debris into the water. Most relevant to these proceedings, as the ATLAS broke apart, a number of components from the vessel's electrical system spilled into the water. It seems that the sheer force of their descent ripped several of the electrical wires out of the vessel as well.

Ultimately, the two largest pieces of the ATLAS were placed into a nearby hopper barge. After conducting a cursory inspection of the remains, all of the experts who were present (including the Deputy Fire Marshal) preliminarily concluded that, given the condition of the ATLAS, it was not possible to determine the cause of the fire at the time. However, several of these experts did suspect that the fire started onboard the ATLAS.

In an effort to keep the costs of the operation down, the JACE and the SWAN SONG interests asked if the wreckage of their vessels could be placed in the hopper barge on top of the remains of the ATLAS and then towed to Imbach's facilities in Baltimore, Maryland. McLaughlin acceded to this request.

### C. The Subsequent Storage And Destruction Of The ATLAS.

The hopper barged arrived at the Imbach facility later that day. On December 1, 1996, the contents of the barge were made available for inspection.

The first inspection occurred on December 2, 1996 when Gunther (who represented the SWAN SONG interests) and Charles Skord (who represented the JACE interests) examined the wreckage to confirm that these two vessels had actually been destroyed in the fire.

Two days later, Georgetown's expert on the cause and origin of the fire (Gerald Kufta) inspected the ATLAS. Given the condition of the wreckage, he concluded that he could not determine the cause of the blaze. Kufta also explained that when he finished his examination of the vessel on December 4, 1996, he considered his investigation to be complete. He simply saw no reason or need to return to the Imbach facility to conduct a subsequent examination.

Some of the other parties, however, were more intent on pursuing the matter. In particular, on December 5, 1996, Chubb's legal counsel wrote to McGeady, stating:

I just spoke with ... our surveyor, and he informed me that you required an authorization letter to preserve the remains [of the vessels] past Friday, December 6, 1996. Please accept this letter authorizing you to preserve the remains of the three vessels until further notice. Additionally, we will be

responsible for the storage charges for the vessels until further notice. If there are any problems with this request, please contact me....

The next inspection occurred on December 10, 1996. That day, Chubb's surveyor (Gunther) examined the ATLAS with William Cysyk, who was Chubb's expert on the cause and origin of the fire. During his examination of the vessel, Cysyk concluded that he required the assistance of an electrical expert before his examination could go any further.

In the days that followed, it seems that Wechsler's representatives used a crane to lift up one of the pieces of the ATLAS. This section was then turned upside down, and one of the vessel's brass propellers was removed. It is this propeller which is the subject of this limitation of liability action. In the process of removing this item from the ATLAS, additional debris spilled out of the hull.

On the morning of December 12, 1996, Gunther and Cysyk returned to the Imbach facility with Chubb's newly-retained electrical expert (Clifton Patton). It seems that Mason and Skord were also present at this time. Prior to the scheduled inspection, Cysyk stated that he would not be able to complete his examination of the vessel because it had recently rained and the water which had collected at the bottom of the hopper barge that held the ATLAS, JACE, and SWAN SONG needed to be removed. Cysyk also explained that he required a crane to re-move the JACE and the SWAN SONG from atop the ATLAS before he could properly inspect the pieces of the hull. Finally, Cysyk stated that he wanted to move what was left of the ATLAS to a different location, where he could reconstruct the ship to gain a better understanding of where the fire might have started and how it might have spread.

At this point in time, McLaughlin informed Chubb's representatives that the boat would be destroyed at noon. Somewhat surprised, Cysyk responded by offering to assume responsibility for all of the costs associated with storing the vessel. McLaughlin, however, replied to this offer by telling Cysyk that the ATLAS was going to be "crunched" at twelve o'clock. There would be no further debate.[4] At his deposition, Mountz explained that he and McLaughlin arrived at this conclusion through a "mutual understanding" with each other.

In light of the destruction of the ATLAS, all of the experts in this case have concluded that they are not able to definitively determine the cause and origin of the November 23, 1996 fire. Many of these experts, however, suspect that the blaze started onboard the ATLAS possibly as a result of the vessel's electrical problems.

## II. DISCUSSION.

All of the claimants have moved for sanctions on the grounds that Wechsler failed to preserve (if not intentionally de-

---

**4.** Although Wechsler claims that all of the interested parties "agreed" to dispose of the ATLAS on December 12th, this portrayal of events is not supported by the record. As previously discussed, on December 5th, Chubb's counsel wrote McGeady a letter which "authoriz[ed him] to preserve the remains of the three vessels until further notice." The letter also informed McGeady that Chubb "w[ould] be responsible for the storage charges for the vessels...." Thus, prior to December 12th, Chubb plainly did not agree to let the ATLAS be destroyed. Also, Cysyk (who had been retained by Chubb) certainly did not agree to the destruction of the ATLAS on December 12th when he asked McLaughlin to preserve the vessel. In fact, Cysyk reiterated Chubb's offer to pay the additional storage costs that day. Thus, the court cannot accept Wechsler's claim that, "by prior agreement of the parties, the ATLAS was disposed of on December 12, 1996." Nor can the court accept Wechsler's representation that, "in accordance with the prior agreement to dispose of the ATLAS on December 12[th], the disposal of the remains of the ATLAS took place." Although the vessel was indeed destroyed on December 12th, it does not appear as if Chubb agreed with this course of action.

stroyed) the ATLAS. Wechsler and Georgetown have also filed motions for summary judgment. According to Wechsler, the court should dispose of the claims against him since their is no evidence to suggest that he is in any way responsible for causing the fire. In its motion, the marina argues that the claims for negligence, breach of contract, and common law bailment fail as a matter of law in light of the evidence that has been produced in this case. Given its significance, the court will first discuss the issue of sanctions. Then, it will turn to an analysis of the summary judgment motions.

A. The Motions For Sanctions.

■ A party who has reason to anticipate litigation has an affirmative duty to preserve evidence which might be relevant to the issues in the lawsuit. *See, e.g., Howell v. Maytag,* 168 F.R.D. 502, 505 (M.D.Pa.1996) (citing *Baliotis v. McNeil,* 870 F.Supp. 1285, 1290 (M.D.Pa.1994)); *accord Shamis v. Ambassador Factors Corp.,* 34 F.Supp.2d 879, 888–89 (S.D.N.Y. 1999) (asking whether the party "knew or should have known that the destroyed evidence was relevant to pending, imminent, or reasonably foreseeable litigation"); *Bass v. General Motors Corp.,* 929 F.Supp. 1287, 1288 (W.D.Mo.1996) (same). A party who breaches this duty by destroying relevant evidence or by allowing relevant evidence to be destroyed may be sanctioned by the court. *See, e.g., Howell,* 168 F.R.D. at 505; *accord Telecom Intn'l Am. Ltd. v. AT & T Corp.,* 189 F.R.D. 76, 81 (S.D.N.Y. 1999). When this destruction is willful or in bad faith and intended to prevent the other side from examining the evidence, the court may impose the most severe sanction of them all—the outright dismissal of a claim or the entry of a default judgment. *See Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 74 (S.D.N.Y. 1991) ("[T]he even harsher sanction of default [or dismissal] may be imposed as a sanction for the intentional destruction of evidence if the party seeking the evidence has been severely prejudiced and no lesser

sanction is adequate."); *accord Telecom,* 189 F.R.D. at 81 (noting that the sanction of dismissal is a "drastic remedy" which should be imposed only in "extreme circumstances," such as when a party wilfully destroys evidence or otherwise acts in bad faith) (relying on *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999)); *Baliotis,* 870 F.Supp. at 1289 ("A sanction that has the 'drastic' result of judgment being entered against the party who has lost or destroyed evidence must be regarded as a 'last resort,' to be imposed only 'if no alternative remedy by way of a lesser, but equally efficient, sanction is available.'") (citations omitted).

■ When determining whether to impose sanctions for the spoliation of evidence, this court must consider the following three factors:

(1) the degree of fault and personal responsibility of the party who destroyed the evidence;

(2) the degree of prejudice suffered by the other party; and

(3) the availability of lesser sanctions which would avoid any unfairness to the innocent party while, at the same time, serving as a sufficient penalty to deter the same type of conduct in the future.

*See Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79 (3d Cir.1994); *accord Indemnity Ins. Co. of N. Am. v. Liebert Corp.,* 1998 WL 363834, at * 3 (S.D.N.Y. June 29, 1998).

■ As the *Schmid* court emphasized, when determining the degree of fault and personal responsibility attributable to the party that destroyed the evidence, the court must consider whether that party intended to impair the ability of the other side to effectively litigate its case. 13 F.3d at 80; *see also Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 334 (3d Cir. 1995) ("[I]t must appear that there has been an actual suppression or withholding of the evidence. No unfavorable inference

arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for."); *accord Collins v. Throckmorton,* 425 A.2d 146, 150 (Del. 1980) ("[W]here a litigant intentionally suppresses or destroys pertinent evidence, an inference arises that such evidence would be unfavorable to his case.").

■ In addition, when considering the degree of prejudice suffered by the party that did not destroy the evidence, the court should take into account whether that party had a meaningful opportunity to examine the evidence in question before it was destroyed. *See Thiele v. Oddy's Auto & Marine, Inc.,* 906 F.Supp. 158, 162 (W.D.N.Y.1995). As the *Thiele* court explained, when one side is completely deprived of the opportunity to inspect the evidence because it was destroyed after the other side had a chance to examine it, then sanctions for spoliation are generally appropriate. *Id.* at 162–63 ("[W]ithout any ability to examine the boat, [the third-party defendant] will be greatly frustrated in its ability to defend its case. Since [the plaintiff] is plainly at fault for allowing the boat to be placed in a landfill, any claims against [the third-party defendant] must be dismissed."); *see also Baliotis,* 870 F.Supp. at 1290–91 ("At a minimum ... an opportunity for inspection should be afforded ... before relevant evidence is destroyed.").

Citing these twin principles, Wechsler argues that "there is no legal basis for the imposition of sanctions against [him]" because he "afforded ... the ... claimants repeated opportunities to inspect the very evidence [that] they now contend was spoliated." Wechsler also argues that the claimants "h[ave] only [themselves] to blame for the lost materials" given their refusal to pay for the construction of a brace or the addition of a third strap when the ATLAS was raised. In order to best address these arguments, the court will separately consider the events which oc-

curred when the ATLAS was raised and those which transpired after the vessel was taken to the Imbach facility and ultimately destroyed.

1. The raising of the ATLAS.

At the outset, the court notes the numerous hurdles which Wechsler's representatives put into place in an apparent attempt to prevent the other parties from inspecting the ATLAS. For example, McLaughlin initially refused to let these interested parties conduct a joint survey of the vessel even though this type of inspection appears to be customary in the field. Later, McLaughlin was only willing to allow these parties to be in the "general vicinity" when the ATLAS was raised. Although she eventually capitulated and permitted the various representatives to be present on the scene, she met them with a length of yellow tape stretched across the dock on the morning that the ATLAS was raised. She then told them that no one could cross this line until she and the Deputy Fire Marshall had inspected the ATLAS. She subsequently instructed McGeady to treat the ATLAS as if it was being raised as wreckage instead of for its forensic value. Finally, McLaughlin refused to consider additional methods of raising the ATLAS which had a higher probability of leaving the vessel intact.

Nevertheless, despite her intransigence, McLaughlin did inform all of the parties who were present that they could raise the ATLAS in any manner that they saw fit as long as they were willing to bear the additional expenses associated with the endeavor. No one, however, took McLaughlin up on her offer. There was not one representative on the scene who was willing to incur the additional costs associated with constructing a cradle or attaching a third sling. Furthermore, none of the representatives were willing to enter into an agreement to divide these additional costs evenly amongst themselves so that one party did not bear the entire financial burden of a more extensive recovery operation.

For example, although the representative for the JACE interests "would have preferred to have ... the remains ... brought up intact," he "wasn't going to spend [his] own money" to do it. Likewise, Georgetown's representative believed that it "wasn't [the marina's] obligation to be financially responsible for the raising of the vessel, the preserving of the vessel or anything of that nature."

■ Under these circumstances, it would be inequitable to sanction Wechsler for the manner in which the ATLAS was raised. In coming to this conclusion, the court is not condoning the conduct of either McLaughlin or Windsor–Mount Joy. In the court's opinion, their behavior should not be emulated. Admittedly, to her credit, McLaughlin did not instruct McGeady to use a clam shell bucket to scoop the ATLAS up off the river bottom piece by piece. Nevertheless, it is troubling that McLaughlin refused to cover the additional expense of using one or two more slings to raise the ship since it does not seem that this method of recovery would have significantly increased the costs of or time needed to complete the salvage operation.

As previously explained, when a party has reason to believe that a lawsuit may be filed, that party has an obligation to preserve relevant evidence. *See Howell,* 168 F.R.D. at 505; *Baliotis,* 870 F.Supp. at 1290; *see also Shamis,* 34 F.Supp.2d at 888–89 (asking whether the party "knew or should have known that the destroyed evidence was relevant to pending, imminent, or reasonably foreseeable litiga-

tion"). Here, McLaughlin and her colleagues at Windsor–Mount Joy had to have either known or suspected that litigation would likely occur. A fire had just destroyed or damaged several boats at a marina, and numerous insurance companies were interested in raising the wreckage to determine the cause and origin of the blaze. However, instead of incurring the relatively minor costs associated with raising the ATLAS in a manner which might better preserve its remains, McLaughlin adopted a strategy which everyone recognized would almost assuredly lead to the vessel's destruction.[5]

Nevertheless, all of the interested parties in this litigation (*i.e.,* those who have moved for sanctions) had the opportunity to raise the ATLAS in any manner that they saw fit. Furthermore, the individuals present at the scene were not the boat owners themselves who had just lost their vessels as a result of the fire. Instead, these individuals were representatives from the various underwriters which insured the boats which had been destroyed. In other words, the people who were present at the scene had a great deal of experience in these situations. Given their level of sophistication, they knew or should have known that lawsuits would eventually be filed. They also had an idea of the types of evidence which would be relevant any ensuing litigation. Furthermore, they represented companies with not only substantial financial resources but also a significant stake in any subsequent legal proceeding. Despite this experience and these interests, none of these individuals

---

**5.** According to Wechsler, the use of additional slings would not have guaranteed the preservation of the ATLAS. In support of this contention, Wechsler has introduced an affidavit by McGeady which states that "[b]ased on [his] experience and knowledge of the condition of the ATLAS, a third sling or even several additional slings would not have prevented the ATLAS from breaking up." While the court does not discredit this averment, it notes that the accuracy of the statement cannot be tested since the ATLAS broke apart as it was raised and was subsequently destroyed

at the shipyard where the debris was being stored. Thus, while it is possible that a third or a fourth sling might have simply cut through the hull of the ATLAS like the other two straps which were used, it is also possible that the use of additional straps might have sufficiently displaced the weight of the vessel to prevent the ship from completely breaking apart. Again, because these alternative methods of raising the ATLAS were not employed, the court cannot determine the accuracy of McGeady's statement.

were willing to pay any of the additional costs associated with the construction of a brace or the use of a third or fourth strap. In fact, these representatives apparently did not even consider the possibility of sharing these expenses amongst themselves.

Given this record, it would be inequitable to sanction Wechsler for the manner in which the ATLAS was raised. In short, while his representatives at Windsor–Mount Joy played a significant role in directing how the vessel would be recovered, it appears that any of the representatives from the other insurance companies could have stepped in at any time to ensure that the ATLAS would be raised in a different manner with a higher probability of preserving the vessel. In this respect, Wechsler is correct. The claimants have only themselves (or, more accurately, their insurers) to blame for the initial loss of the ATLAS. Even though these parties might be prejudiced by the destruction of this evidence, this prejudice was avoidable. In short, the claimants had the opportunity and the ability to preserve the vessel, yet they failed to do so. Under these circumstances, the court cannot sanction Wechsler for an event which was not entirely of his own making.

Finally, the court wishes to emphasize that if McLaughlin had been dealing with the victims of the fire themselves instead of with representatives from their insurance companies, this decision would have been different. In the opinion of the court, it is one thing to hold sophisticated parties with vast financial resources responsible for their failure to take seemingly reasonable steps to preserve evidence which they know or should know might be relevant to a future lawsuit. It is quite another thing to give the victims of an accident a ultimatum like the one which was issued here. In general, victims are lay people. They typically do not possess a substantial amount of knowledge concerning the operation of the legal system or the requirements imposed by the law.

More important, as victims, they will have just suffered some form of tragedy. Thus, they may not be in the best position, whether psychologically or financially, to take steps which would be in their long-term interests.

Here, McLaughlin did not put the victims in this position. Instead, she was dealing directly with representatives from the companies which had insured the victims. Because these commercial entities had the knowledge and experience to appreciate the significance of the ATLAS, in addition to the financial resources to preserve the vessel, they cannot shift all of the blame for the manner in which the recovery operation was conducted to Wechsler. The court, however, does not reach the same conclusion concerning the ultimate destruction of the vessel.

### 2. The storage and destruction of the ATLAS.

The wreckage of the ATLAS was first made available to the parties for inspection on December 2, 1996. On that day, representatives on behalf of the SWAN SONG and the JACE interests (Gunther and Skord) examined the wreckage primarily to confirm that these two vessels had actually been destroyed in the fire.

On December 4, 1996, one of Georgetown's representatives (Kufta) inspected the ATLAS. He concluded his investigation that day, finding that it was not possible to determine the cause of the fire given the condition of the ATLAS. As Kufta has since explained, after December 4th, he saw no need to return to the Imbach facility for a subsequent examination.

Chubb, which had insured the SWAN SONG, however, was interested in further examining the ATLAS. For this reason, one of its attorneys sent McGeady a letter on December 5, 1996 which asked him to "preserve the remains of the three vessels until further notice." The letter also informed McGeady that Chubb "w[ould] be responsible for the storage charges for the vessels...."

The next inspection occurred on December 10, 1996. That day, Gunther and Cysyk examined the ATLAS to determine the cause and origin of the fire. However, Cysyk postponed part of the inspection because he required additional assistance from an electrical expert.

Subsequently, Wechsler's representatives used a crane to lift one of the pieces of the ATLAS out of the barge. This section was then turned upside down, and one of the vessel's brass propellers was removed. In the process, additional debris spilled out of the hull.

On the morning of December 12, 1996, Gunther and Cysyk returned to the Imbach facility with Patton (their electrical expert). Mason and Skord also appear to have been there. Upon observing the remains of the ATLAS, JACE and SWAN SONG in the hopper barge, Cysyk said that he would not be able to complete his examination that day. First, the barge needed to be drained of the rain water which had accumulated as the result of a recent storm. Second, the JACE and the SWAN SONG were still sitting on top of the ATLAS and needed to be removed before a close inspection of the vessel could proceed. Finally, Cysyk stated that he wanted to move the remains of the ATLAS to a nearby location where he could reconstruct the ship to gain a better understanding of where the fire might have started and how it might have spread.

In response, McLaughlin informed Cysyk and the others who were there that the ATLAS would be "crunched" at noon. Although Cysyk told McLaughlin that Chubb would assume responsibility for all of the costs associated with storing the vessel, she informed him that the ATLAS would be destroyed by twelve o'clock. Over the objections of the parties, the vessel was disposed of that day. According to Mountz, he arrived at this decision through a "mutual understanding" with McLaughlin.

a. The degree of fault and personal responsibility on the part of Wechsler and his representatives.

Under these circumstances, there can be no question that Wechsler's representatives acted intentionally when they destroyed the ATLAS. Cysyk and others at the scene had asked for the vessel to be preserved. Cysyk even explained that Chubb would bear the additional costs associated with storing the wreckage. Nevertheless, McLaughlin ordered the ship crushed. Thus, the destruction of the ATLAS was not accidental or inadvertent. *See Brewer,* 72 F.3d at 334 ("No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for.").

Furthermore, given the record, it would appear that this conduct was intended to prevent the other interests from further inspecting the ATLAS. From the outset, McLaughlin was reluctant to let any party examine the vessel. She initially refused to permit a joint inspection. She later stated that the other parties could only be in the "general vicinity" of the salvage operation. It was only after the parties pressed the issue that McLaughlin agreed to allow them on the scene. However, when they first arrived, McLaughlin had stretched a length of yellow tape across the dock. Standing in front of it, she told the others that they would have to stay behind the line until she and the Deputy Fire Marshall conducted their inspection of the ATLAS. Furthermore, even if the court were to put aside that intractable stance which McLaughlin took concerning the manner by which the ATLAS would be raised, once the ship reached the surface of the water, McLaughlin told McGeady that he should simply remove and dispose of the wreck instead of attempting to preserve the forensic value of the vessel.

In addition, even though McLaughlin may have permitted a number of initial

inspections to occur at the Imbach facility, there appears to have been no reason to destroy the ATLAS on December 12, 1996. Chubb had already committed to paying the additional storage costs of the vessel, and Cysyk emphasized this point when he asked McLaughlin to preserve the boat. Specifically, he told McLaughlin, "If you're going to destroy [the ATLAS] anyway, give it to me so that I can have the boat.... I'm willing to pay for all the costs. It's not going to cost you a dime...." Given this statement, McLaughlin had no reason to dispose of the ATLAS. In fact, the only reason which the court can discern for destroying the vessel under these circumstances would be to prevent the claimants from inspecting the ship and possibly discovering the cause and origin of the fire.[6]

Admittedly, Wechsler correctly points out that "[t]he scope of the duty to pre- serve evidence is not boundless." *See Baliotis*, 870 F.Supp. at 1290–91 (quoting *Hirsch v. General Motors Corp.*, 266 N.J.Super. 222, 628 A.2d 1108, 1122 (1993).) However, as these and other cases make clear, a party still must act reasonably under the circumstances. *See, e.g., Kolanovic v. Gida*, 77 F.Supp.2d 595, 602–03 (D.N.J.1999); *accord Hirsch*, 628 A.2d at 1122. In this case, it was not reasonable to destroy the ATLAS after another party had already agreed to pay for the vessel's continued storage. *Cf. Hirsch*, 628 A.2d at 1122 (explaining that it is reasonable to impose a deadline for inspecting the evidence and to insist that the other party bear the expense of preserving the evidence if it is needed beyond that deadline). In addition, the ATLAS itself had only been in storage for two weeks, and at least one interested party was asking for the vessel to be preserved so that a

---

**6.** In coming to this conclusion, the court has taken into account the forged letter which was faxed to Loller from some one at Wind-sor–Mount Joy. Although Wechsler claims that this item of correspondence "has nothing whatsoever to do with ... the November 30[th] breakage of the ATLAS ... [or] the December 12[th] disposal of the ATLAS," the court disagrees. As previously explained, someone at Windsor–Mount Joy apparently sent the letter to Loller in the Spring of 1997 in an effort to convince the surveyor that he had indeed inspected the ATLAS three years earlier and found that all of the necessary repairs to the vessel's electrical system had actually been made.

Of course, there are no records of any kind indicating that Loller actually boarded the ATLAS in August of 1994 to conduct an inspection. Nor are they any records or re-ceipts showing that the repair work which Loller claims to have seen was actually per-formed. Furthermore, Wechsler has not presented any testimony (whether through deposition or affidavit) from the person who supposedly made these repairs. Moreover, even though Loller claims that he called Mountz to tell him that the inspection had been completed and that all of the necessary repairs had been made, there are no records or notations of any kind to support this claim. There are no telephone logs which show that such a call was actually placed. Nor are their any notes which memorialize the telephone conversation which Loller claims to have had with Mountz concerning the follow-up inspection.

As a result, it is distinctly possible that Loller did not inspect the ATLAS in August of 1994. If so, then he certainly could not have verified that the vessel's electrical system had been repaired.

Furthermore, the court notes that the Au-gust 25th letter, which is a conceded forgery, was sent to Loller from someone at Windsor–Mount Joy. With the exception of this letter, there does not appear to be any evidence from their files which indicates that any re-pairs to the ATLAS had been made. Thus, it is possible that certain individuals at Wind-sor–Mount Joy knew or at the very least sus-pected that no repairs had been made to the vessel even though the three previous surveys had recommended this course of action.

When viewed in this light, McLaughlin's conduct is quite troubling. Although she may have been joking when she told the other insurance representatives on the scene that Windsor–Mount Joy would be in a better de-fensive position if the ATLAS did break apart, the court takes this comment very seriously given the events which transpired in this case.

Therefore, given the evidence in the record, the court concludes that the ATLAS was de-stroyed with the intent of preventing the other claimants from further inspecting the vessel and, thus, possibly discovering the cause and origin of the fire.

more thorough inspection could be conducted. *Cf. Kolanovic,* 77 F.Supp.2d at 603 (concluding that the defendant acted reasonably when he preserved the evidence "for at least seventeen (17) months after the accident occurred" especially since "he was never affirmatively told or asked by [the] plaintiffs to retain the [evidence], nor did [the] plaintiffs request that he send the ladder to [an expert for testing]").

In this respect, the court is not persuaded by Wechsler's argument that he fulfilled his duty to preserve evidence by simply providing "an opportunity for inspection before the evidence in question [wa]s destroyed." This statement paints with too broad a brush. In the opinion of the court, the crucial question is whether the other side had an *adequate* or *meaningful* opportunity to inspect the evidence. *See Henderson v. Tyrrell,* 80 Wash.App. 592, 910 P.2d 522, 532 (1996) ("Another important consideration is whether the loss or destruction of the evidence has resulted in an investigative advantage for one party over another or whether the adverse party was afforded an adequate opportunity to examine the evidence."); *American States Ins. Co. v. Scripto–Tokai Corp.,* 94 Ohio Misc.2d 172, 704 N.E.2d 1280, 1284 (1997) ("[W]hen the item made unavailable by the offending party is inextricably connected to the evidence which the offending party believes to have caused the fire and if its importance is foreseeable, such evidence should be retained for inspection until the opposing party has a reasonable opportunity, after notice, to conduct an examination by its experts.") (relying on *Hirsch,* 628 A.2d at 1122).

■ Of course, when a party is denied any opportunity to examine the evidence, this test would automatically be satisfied. *See, e.g., Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.,* 174 F.3d 801, 804 (6th Cir.1999) ("A court may exclude expert testimony as a sanction for spoiling evidence if it determines that the evidence has been intentionally altered or destroyed

by a party or its expert before the defense had an opportunity to examine the evidence."); *Unigard Sec. Ins. Co. v. Lakewood Engineering & Mfg. Corp.,* 982 F.2d 363, 369 (9th Cir.1992) (emphasizing that the plaintiff's "destruction of evidence was not in dispute" and noting that this misconduct "precluded [the defendant] from any opportunity to inspect the evidence"); *see also DeLong v. A–Top Air Conditioning Co.,* 710 So.2d 706, 707 (Fla.Dist.Ct. App.1998) ("After a careful review of the record before us, we cannot conclude that the lower court abused its discretion in imposing the ultimate sanction of dismissal with prejudice where the appellees demonstrated their inability to completely set forth their defense without having had the opportunity to examine and test the lost evidence.") (per curiam); *accord Conderman v. Rochester Gas & Elec. Corp.,* 180 Misc.2d 8, 687 N.Y.S.2d 213, 216 (N.Y.Sup. Ct.1998) ("When a party alters, loses or destroys key evidence before it can be examined by the other party's expert, the court should dismiss the pleadings of the party responsible for the spoliation"). However, in the opinion of the court, this standard could also be met when a party who has already conducted an initial inspection of the evidence asks for the material to be preserved so that additional tests or experiments can be conducted. Disposing of the evidence under these circumstances would generally be considered unreasonable since it would be unacceptable for one side to destroy evidence when it knows that the other side is interested in preserving the material for further review or inspection. The unreasonableness of this type of conduct is only heightened when the side asking to preserve the evidence has also offered to pay all of the additional costs associated with its continued storage.

■ This is exactly what occurred her. As previously explained, no party had a meaningful opportunity to physically inspect the ATLAS when it was raised because the Deputy Fire Marshall would not

let anyone onboard the vessel out of a concern for their safety. Although the ATLAS may have been photographed or videotaped at the time, the court does not consider this type of cursory review to equate with an actual physical inspection of the vessel.

Moreover, although several experts concluded that they would not be able to determine the cause and origin of the fire given the condition of the ATLAS after it was raised, Cysyk believed that he could reconstruct the ship and, thus, gain some insight into where and how the fire started. In fact, as he testified at his deposition,

> My goal would have been to recover every possible piece of evidence from the barge, the boat itself, the items on the boat, those items that had fallen into the water, recover all of those items and put the boat back together again. Having done that ... I feel pretty confident [that] I could have figured out where the fire started and what caused it.

It was for this reason that Chubb was willing to incur the additional storage costs associated with preserving the vessel.

Thus, from Wechsler's perspective, the only reason to dispose of the boat would be to prevent the claimants from possibly discovering the cause of the fire. If Wechsler and his representatives truly considered the ATLAS to be exculpatory, they would not have destroyed the wreckage so quickly.

b. The degree of prejudice suffered by the other parties.

Admittedly, it seems that Cysyk had never reconstructed a vessel before, although he did have substantial experience reconstructing the accident scenes of numerous buildings which had burned down. Furthermore, as pointed out at Cysyk's deposition, it was not clear whether reconstructing the ATLAS would actually enable the expert to determine if the fire started onboard the vessel. In addition, even if he could make this determination,

it might not be possible to determine how the fire actually started. Again, the AT-LAS had broken apart during the recovery operation and spilled a large portion of its contents into the water. Thus, it might not have been possible to recover numerous key pieces of evidence, such as parts of the hull or components from the vessel's electrical system. Furthermore, even if these items could have been recovered, they might have been so badly damaged as to be of little or no value in determining the cause and origin of the fire.

Unfortunately, with the destruction of the ATLAS, it is now impossible to definitively answer these questions. It is, therefore, impossible to determine whether there was any merit to Cysyk's reconstruction theory.

For example, if the ATLAS had been preserved, Cysyk could have at least attempted to reconstruct the vessel. If his efforts proved successful, he might have been able to determine the cause and origin of the fire. Specifically, he might have been able to prove that the fire originated onboard the ATLAS. Of course, Wechsler could have retained his own expert who might have come to a different conclusion given the evidence. In this event, the parties could have litigated the merits of the issue before the court. However, with the destruction of the ATLAS, they are now precluded from doing so.

Conversely, Cysyk might have found that the fire started elsewhere and simply spread to the ATLAS. In the alternative, he could have determined that it was not possible to come to any conclusions concerning the cause or origin of the fire because certain crucial pieces of evidence were either missing or so severely destroyed as a result of the fire that they were of no forensic value.

Moreover, even if Cysyk might not have been able to identify the cause and origin of the fire after reconstructing the AT-LAS, he still might have been able to confirm whether the electrical problems which had been noted in the three previous

insurance surveys had been corrected. For example, Cysyk might have found that much of the wiring remained loose, spliced, and ungrounded. Of course, Cysyk could have instead found that the needed repairs had in fact been made.

In these respects, Cysyk's plan to reconstruct the ALAS could have absolved Wechsler from liability just as easily as it could have implicated him in the fire. When viewed in this light, the prejudice suffered in this case would seem to be the lost opportunity to reach a more definitive conclusion concerning the cause and origin of the fire. The court views this type of prejudice extremely seriously.

■ The court does not agree with Wechsler's claim that Cysyk's reconstruction plan "was actually pointless since there was no realistic hope that 'reconstruction' efforts could identify the cause of the fire." Under *Schmid,* a party need only "come forward with plausible, concrete suggestions as to what the [lost] evidence might have been." 13 F.3d at 80. Contrary to Wechsler's apparent contentions, a party need not conclusively demonstrate that the evidence would have established liability on the part of the spoliator. *See, e.g., Gates Rubber Co. v. Bando Chemical Industries, Ltd.,* 167 F.R.D. 90, 115 (D.Colo.1996) (noting that the party moving for sanctions "has the initial burden to establish *some minimal relevancy* of any discarded or destroyed materials to the circumstances of the litigation") (emphasis added); *see also Skeete v. McKinsey & Co., Inc.,* 1993 WL 256659, at *7 (S.D.N.Y. July 7, 1993) (explaining that the "moving party usually sets forth some type of extrinsic evidence as to the content of the missing materials which demonstrates the extent to which such materials would have been harmful to the spoliator"); *Turner,* 142 F.R.D. at 76–77 (requiring "a nexus between the proposed [adverse] inference and the information contained within the lost evidence" which is generally demonstrated by "some extrinsic evidence of the content of the evidence ... to determine in what respect and to what extent it would have been detrimental"). As other courts have noted in a related context,

> it is impossible to know what the destroyed evidence would have shown.... It would seem to be pure guesswork, even if the destroyed evidence went against the spoliator, to calculate what it would have contributed to the plaintiff's success on the merits [in] the underlying lawsuit.

*See Petrik v. Monarch Printing Corp.,* 150 Ill.App.3d 248, 103 Ill.Dec. 774, 501 N.E.2d 1312, 1320 (1987) (questioning the propriety of recognizing an independent cause of action for the tort for spoliation); *see also Federated Mut. Ins. Co. v. Litchfield Precision Components, Inc.,* 456 N.W.2d 434, 438 (Minn.1990) (quoting *Petrik* for the same reason); *Edwards v. Louisville Ladder Co.,* 796 F.Supp. 966, 969–70 (W.D.La. 1992) (quoting *Federated* ).

In this case, there can be no question concerning the relevancy of the ATLAS to any future legal proceeding. The vessel had burned down, and several individuals (including the Deputy Fire Marshall) apparently believed that the fire began onboard the ship. *See, e.g., Mathias v. Jacobs,* 197 F.R.D. 29, 38 (S.D.N.Y.2000) (requiring "some showing indicating that the destroyed evidence would have been relevant to the contested issue.") (quoting *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998)); *see also Gates,* 167 F.R.D. at 104 (considering "the materiality and value of the suppressed evidence upon the ability of a victim to fully and fairly prepare for trial").

Furthermore, with the destruction of the ATLAS, the claimants have been denied a full and fair opportunity to prepare their case for trial. Again, without the vessel, there appears to be no way to prove or disprove where and how the fire started. *See Gates,* 167 F.R.D. at 104 ("[W]here the destruction of evidence results in substantial impairment to a party's abilit[y] to prepare for trial, serious sanctions might be warranted."); *see also China Ocean*

*Shipping (Group) Co. v. Simone Metals Inc.*, 1999 WL 966443, at *3 (N.D.Ill. Sept.30, 1999) ("[The] defendants ... are severely prejudiced by the destruction of this evidence since it is no longer able to pursue or even establish their claims and defenses that the cause of the derailment was a defective shipping container."). There is also no way to independently confirm whether the numerous problems with the yacht's electrical system had in fact been repaired.

The ATLAS was not the type of evidence that could be considered "cumulative, insignificant, or of marginal relevance." *See Gates*, 167 F.R.D. at 104 (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 924 (1st Cir.1988)); *see also Mathias*, 197 F.R.D. at 38 ("[W]here the victim of the spoliation has alternative means of obtaining equivalent evidence or where the destroyed evidence is cumulative, neither an adverse inference nor dismissal of the complaint may be an appropriate sanction."). The vessel was, if not the only, then certainly the best or most relevant piece of evidence with respect to the cause and origin of the fire. *See Howell*, 168 F.R.D. at 507 (concluding that the defendant "suffer[ed] greater prejudice due to the destruction of the fire scene" since "it ha[d] been denied the opportunity to examine other possible causes of the fire"); *cf. Baliotis*, 870 F.Supp. at 1290 ("If the 'fire scene' had been obliterated by some 'act of God' or if there had been some other destruction of the evidence of the fire scene, such as a subsequent fire, for which [no one was] responsible, [the third-party defendants] would not be entitled to preclusion of otherwise relevant evidence.").

On this point *Howell* is particularly instructive. There, the plaintiffs claimed that a defect in their microwave started a fire in their kitchen which spread to their entire house, causing it to burn down. 168 F.R.D. at 503. The house, however, was subsequently demolished before the defendant had an opportunity to inspect the scene. *Id.* at 506. As the district court explained, "denying [the defendant] an opportunity to examine the remainder of the kitchen wiring and appliances le[ft that party] to rely solely on [the] plaintiffs' investigation." *Id.* at 507. In other words, without the opportunity to conduct its own investigation of the scene, the defendant was placed at a severe disadvantage.

Here, as previously explained, any initial inspection of the ATLAS after it had been raised to the surface of the water was at best cursory. While the vessel may have been photographed or videotaped, no one was allowed onto the vessel to physically inspect it. Thus, none of the claimants had an actual opportunity to visually inspect what many considered to be the scene of the fire's origin. Likewise, given the manner in which the ship's wreckage was placed in the hopper barge along with the remains of the JACE and the SWAN SONG, Cysyk concluded that he could not conduct a meaningful examination of the ATLAS during his December 12th inspection. As the court has already found, the limited times that the vessel was made available for inspection did not afford Cysyk an adequate opportunity to examine the wreckage since he wanted to preserve the remains for the purpose of reconstructing the vessel.

The court also considers it telling that the ATLAS was destroyed one or two days after its brass propeller was removed. As mentioned earlier, this propeller is the only item which was salvaged from the ship. It is worth approximately $500 and, under the governing laws of admiralty, serves as the cap on Wechsler's liability if this action were allowed to proceed. *See* 46 App.U.S.C.A § 183 (West Supp.2000). Once Wechsler's representatives obtained what they needed from the wreckage, they apparently decided to destroy the remains even though at least one other party had asked for the ship to be preserved for the purposes of reconstruction. Furthermore, the court again notes that continuing to

preserve the wreckage of the ATLAS would not have imposed any additional costs on Wechsler or Windsor–Mount Joy since Chubb had already agreed to assume all of the expenses associated with the continued storage of the vessel.

Thus, from Wechsler's perspective, the only downside to preserving the vessel would have been that the wreckage might somehow establish liability on his part. The remains could have shown that the numerous electrical problems noted in the three prior insurance surveys had never been corrected. The remains might have also shown that the fire started as a result of the faulty wiring onboard the yacht. While Wechsler contends that the remains of the ATLAS could have just as easily absolved him from liability, the court finds it highly doubtful that Wechsler and his representatives would have gone forward with the destruction of the ship if they had truly believed that the wreckage might prove exculpatory. *Cf. Donato,* 172 F.R.D. at 84 (explaining that the manner in which the evidence is destroyed may provide "some evidence for the inference that the destroyed evidence may have been detrimental to [the] defendant").

Finally, the court disagrees with Wechsler's contention that several of the claimants cannot legitimately claim that they were prejudiced by the December 12th destruction of the ATLAS because their experts had already concluded that it would not be possible to determine the cause or origin of the fire given the condition of the wreckage.

For example, although Kufta (who was Georgetown's expert) has testified that he completed his inspection of the ATLAS on December 4th and was satisfied with his efforts and the access which he had been given to the vessel, Mason specifically asked for the vessel to be preserved on December 12th after speaking with Reliance (Georgetown's insurer). Mason also testified that Reliance was apparently willing to share the additional storage costs with Chubb in the event that the vessel

was not destroyed. Other claimants might have made similar offers if the ATLAS had been preserved. In addition, if Chubb could have established that the fire started onboard the ATLAS and then spread to the dock and other vessels, these findings would have endured to the benefit of all the claimants even if they did not originally join in Chubb's reconstructive efforts.

Thus, unlike the raising of the ATLAS where none of the claimants were willing to incur the additional costs of a more extensive recovery operation, at least one claimant was willing to pay for the continued storage and preservation of the subsequent wreckage so that an attempt could be made to reconstruct the vessel. Furthermore, at least one of the other claimants appears to have been willing to share in these expenses. On December 12, 1996, these parties told McLaughlin that they wished to keep the remains of the vessel preserved. Cysyk specifically told her that he planned to reconstruct the vessel. She, however, responded by having the ATLAS destroyed that day at noon.

■ As a result, the claimants have suffered severe prejudice. In order to recover in this limitation of liability action, they must prove that (1) an act of negligence or a condition of unseaworthiness onboard the ATLAS caused the fire at the marina and (2) Wechsler had knowledge of this negligent act or unseaworthy condition. *See In re Complaint of Hercules Carriers, Inc.,* 768 F.2d 1558, 1563 (11th Cir.1985) (citing *Farrell Lines, Inc. v. Jones,* 530 F.2d 7, 10 (5th Cir.1976)); accord *In re Complaint of Bankers Trust Co.,* 651 F.2d 160, 169 (3d Cir.1981). However, as all of the experts apparently concede, it is not possible to satisfy their burden of proof on these elements because the ATLAS has since been destroyed. While several of the experts seem to believe that the fire started onboard the vessel, they cannot definitively prove their suspicions.

Furthermore, now that the ATLAS has been destroyed, none of the claimants can prove that the numerous electrical problems listed in the 1987, 1991, and 1993 insurance surveys were not actually corrected. Given the lack of corroborating evidence, it seems likely that these repairs were not in fact made. However, without the vessel, these suspicious also cannot be confirmed.

Thus, although Wechsler dismisses Cysyk's reconstruction theory as purely speculative, it is not speculation that the ATLAS was over thirty years old at the time of the fire. It is also not speculation that the vessel was made almost entirely of wood. Nor is it speculation that the ship had failed three previous marine surveys which all concluded that the vessel was not a good insurance risk since there were serious problems with the onboard electrical systems. Furthermore, as repeatedly discussed, save for Loller's inconsistent testimony on the topic, there is no evidence that any of these electrical problems were actually corrected. Finally, it is not speculation that, of the numerous vessels which caught fire that night, the ATLAS was the most severely burned. If fact, it was so badly damaged that it was the only ship that sank to the bottom of the river. None of this is speculation.

Given this undisputed evidence, it is distinctly possible that the numerous electrical problems onboard the ATLAS were never corrected. Thus, it is quite possible that the fire started onboard the ATLAS as result of these electrical problems and then spread to the dock and other vessels in the marina. Cf. Donato, 172 F.R.D. at 83–84 (finding that "[t]here [wa]s at least a reasonable likelihood that the headlights were, in fact, off at the crucial time" given the conflicting testimony about the events). Preserving the ATLAS could have either dispelled these possibilities or established them as a certainty.

In light of the extrinsic evidence concerning the condition of the ATLAS and the events surrounding its destruction, the court concludes that the claimants have demonstrated the relevancy of the vessel to these proceedings. See, e.g., Gates, 167 F.R.D. at 115 (explaining that the party moving for sanctions "has the initial burden to establish some minimal relevancy of any discarded or destroyed materials to the circumstances of the litigation"); Turner, 142 F.R.D. at 76–77 (requiring "some extrinsic evidence of the content of the evidence ... to determine in what respect and to what extent it would have been detrimental"). Furthermore, the claimants have provided "plausible, concrete suggestions" concerning what the reconstruction of the ATLAS might have shown. See Schmid, 13 F.3d at 80 (imposing this requirement). Specifically, Cysyk has testified that the vessel itself was relevant evidence since a reconstruction of its damaged hull would have provided some insight into where the fire started and how it spread throughout the vessel. Likewise, the electrical components which remained intact might have shed some light on whether the fire started onboard the ATLAS as a result of the ship's AC or DC systems. Furthermore, to the extent that certain key components might have been missing, Cysyk has testified that he would have retained divers to recover the materials from the bottom of the river so that they could be reassembled and placed in the reconstructed vessel.

However, with the destruction of the ATLAS, the majority of this evidence was lost along with the need to salvage any evidence which might have fallen into the river when the ATLAS broke apart. Because the loss of this evidence has prevented the claimants from establishing their case, the court concludes that they have suffered significant prejudice. In short, they have been completely prevented from attempting to establish their claims. They cannot prove that, contrary to Loller's questionable testimony, the alleged repairs to the vessel's electrical system were not in fact made. The claimants also cannot prove that the fire started onboard the

ATLAS as a result of these electrical problems or possibly for some other reason. In this respect, the claimants have suffered the most severe prejudice of all since they are unable to pursue their claims. Thus, the court now turns to its determination of the appropriate sanction.

c. The appropriate sanction.

■ This court has the inherent power to impose sanctions against a party that has destroyed evidence which is relevant to a legal proceeding. *See Baliotis,* 870 F.Supp. at 1289 ("Authority to impose sanctions for the destruction of relevant evidence is recognized under ... the inherent power of district courts to utilize sanctions in order to 'manage their own affairs so as to achieve the orderly an expeditious disposition of cases.' ") (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)); *accord Unigard,* 982 F.2d at 368 (also citing *Chambers* ); *Donato v. Fitzgibbons,* 172 F.R.D. 75, 81 (S.D.N.Y.1997). In its discretion, the court may impose a wide range of sanctions for the spoliation of evidence depending upon the severity of the circumstances. *See, e.g., Bowman v. American Med. Sys., Inc.,* 1998 WL 721079, at *5 (E.D.Pa. Oct. 9, 1998); *Donato,* 172 F.R.D. at 81 ("The decision to impose sanctions, as well as the appropriate sanction to be fashioned, lie within the sound discretion of the trial court."). From least to most severe, the court can (1) issue an instruction at trial which permits the fact-finder (here, the court) to draw an adverse inference from the destruction of the ATLAS, (2) exclude any favorable report prepared by Wechsler's expert on the cause or origin of the fire, (3) shift the burden of proof to Wechsler which would require him to show that the fire did not result from his negligence or (4) dismiss his case or enter judgment against him which would effectively remove the cap on his liability. *See Howell,* 168 F.R.D. at 507; *see also Unigard,* 982 F.2d at 369 (noting that the district court had the discretion to exclude certain evidence or shift the burden of proof) (citing, *inter alia, Welsh v. United States,* 844 F.2d 1239, 1246–47 (6th Cir.1988)).

■ When considering which sanction to impose, the court should take into account the twin aims of punishing the culpable while, at the same time, deterring others from engaging in similar conduct in the future. *See, e.g., National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). Generally, the court should impose the most severe sanction of dismissal or default only as a last resort, reserving it for those extreme or drastic cases where a party has acted callously or in bad faith and, as a result, has severely prejudiced the other side. *See, e.g., Bowman,* 1998 WL 721079, at *6; *see also Baliotis,* 870 F.Supp. at 1289 ("A sanction that has the 'drastic' result of judgment being entered against the party who has lost or destroyed evidence must be regarded as a 'last resort,' to be imposed only 'if no alternative remedy by way of a lesser, but equally efficient, sanction is available.' ") (citations omitted); *Gates,* 167 F.R.D. at 104 ("The imposition of dispositive sanctions 'should be confined to the flagrant case in which it is demonstrated that the failure to produce materially affect[s] the substantial rights of the adverse party and is prejudicial to the presentation of his case.' ") (quoting *Wilson v. Volkswagen of Am., Inc.,* 561 F.2d 494, 503 (4th Cir.1977)) (internal quotation marks omitted); *cf. Harris v. City of Philadelphia,* 47 F.3d 1311, 1330 n. 18 (3d Cir.1995) (discussing a similar standard for issuing the sanction of dismissal for discovery abuses) (citing *Poulis v. State Farm Fire & Casualty Co.,* 747 F.2d 863, 868 (3d Cir.1984) and *National Hockey League,* 427 U.S. at 643, 96 S.Ct. 2778).

In this case, a spoliation instruction which allows the court to draw an adverse inference from the destruction of the ATLAS at trial would not serve as a sufficient penalty or deterrent. As previously discussed, given the vessel's destruction, no

party can prove that the fire actually started onboard the ATLAS. Nor can any party prove that the fire was the result of negligence or an unseaworthy condition. Also, as Wechsler has pointed out, the spoliation inference cannot serve as a substitute for actual evidence. *See Hartford Ins. Co. of Midwest v. American Automatic Sprinkler Sys., Inc.,* 23 F.Supp.2d 623, 627 (D.Md.1998) (explaining that the adverse inference "cannot be used by [a party] as a surrogate for presenting evidence of ... negligence in his *prima facie* case") (quoting *Anderson v. Litzenberg,* 115 Md. App. 549, 694 A.2d 150, 156 (1997);) *see also Stanojev v. Ebasco Serv., Inc.,* 643 F.2d 914, 923–924 n. 7 (2d Cir.1981) (explaining that the spoliation "inference could not serve to supply the missing element of the *prima facie* case") (cited in *Hartford*); *accord Collins,* 425 A.2d at 150 (holding that the adverse "inference does not amount to substantive proof and cannot take the place of proof of a fact necessary to the [plaintiff's] case") (relying on *Larsen v. Romeo,* 254 Md. 220, 255 A.2d 387, 391 (1969)). Thus, this sanction possesses no punitive or deterrent value.

For similar reasons, a sanction which would preclude Wechsler from introducing an expert report or other evidence on the cause or origin of the fire is equally ineffective. First, in this action, the claimants bear the burden of proving Wechsler's negligence. *See Hercules Carriers,* 768 F.2d at 1563; *Bankers Trust,* 651 F.2d at 169. Thus, Wechsler need not introduce any evidence to disprove his liability. Instead, he can simply rest on his attack of his opponent's evidence. Second, as previously discussed, now that the ATLAS has been destroyed, the claimants cannot carry their burden of proof on the issue of Wechsler's liability. They cannot prove that the fire started onboard the ship. Nor can they establish the cause of the fire. Thus, as trial, Wechsler would have no need to introduce any rebuttal evidence. Consequently, this sanction also possesses no punitive or deterrent value.

While the court could shift the burden to Wechsler and require him to prove that he was not negligent and that his negligence did not cause the fire, the parties apparently agree that this sanction would effectively result in the entry of judgment against Wechsler because, like the claimants, he is unable to offer definitive proof concerning the cause and origin of the fire. In other words, while the claimants cannot prove that the fire started onboard the ATLAS, Wechsler cannot prove that the fire started elsewhere and then spread to the vessel. As a result, this sanction is equivalent to a dispositive one. It is for this reason that, given the circumstances of this case, the court believes that a dispositive sanction is warranted.

First, the court has found that the ATLAS was intentionally destroyed in order to prevent the other claimants from further inspecting the vessel and, thus, possibly discovering the cause and origin of the fire. Again, Chubb had already agreed to pay for all future storage costs associated with the yacht. Cysyk reiterated this pledge when he asked McLaughlin to preserve the remains of the vessel on December 12th. Cysyk also told McLaughlin that he wanted to preserve the wreckage so that he could try to reconstruct the ship. In response, McLaughlin ordered the ATLAS to be destroyed that day. As previously explained, this response was completely unreasonable under the circumstances and indicative of a bad faith effort to interfere with the claimants' ability to bring subsequent legal action. Given this heightened degree of fault and personal responsibility on the part of Wechsler and his representatives, a severe sanction is entirely appropriate. *See, e.g., Turner,* 142 F.R.D. at 74 ("[T]he even harsher sanction of judgment by default [or dismissal] may be imposed as a sanction for the intentional destruction of evidence if the party seeking the evidence has been severely prejudiced and no lesser sanction would be adequate."); *cf. Schmid,* 13 F.3d at 80 (asking whether the plaintiff "intend-

ed to impair the ability of the potential defendant to defend itself"); *Baliotis,* 870 F.Supp. at 1291 ("Evidence warranting a finding of bad faith may support the drastic sanction of preclusion of evidence that could result in the entry of judgment against the spoliating party.").

Second, as previously explained, the destruction of the ATLAS has resulted in severe prejudice to the claimants. Presently, it is not possible for them to disprove that, contrary to Loller's testimony, the electrical problems onboard the ATLAS were not corrected. In addition, the claimants are unable to prove that the fire started onboard the ATLAS. While some of the experts may suspect or believe that the fire began on the yacht, given the severe damage that it sustained, it seems that none of them possess sufficient information to properly support their suspicions or beliefs. As other courts have noted, the complete inability to pursue or establish one's claims is highly prejudicial. *See China Ocean Shipping,* 1999 WL 966443, at \*3; *see also Beers v. General Motors Corp.,* 1999 WL 325378, at \*5 (N.D.N.Y. May 17, 1999) (imposing the severe sanction of dismissal because the defendant was "unable to effectively show that the fan blade broke for reasons other than [the] defect" alleged by the plaintiff; no other sanction would "restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.") (relying on *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999)).

On these grounds alone, the imposition of a dispositive sanction is warranted. *See, e.g., Bowman,* 1998 WL 721079, at \*5–6 ("[N]o sanction other than outright dismissal is appropriate given the culpability of the [p]laintiff for the spoliation of the evidence and the impossible task [the d]efendant would face defending against this action as a result of it."); *see also China Ocean Shipping,* 1999 WL 966443, at \*4 ("[N]o sanction short of dismissal ... would put [the defendants] in their rightful

position since they would be unable to properly defend against [the plaintiffs'] claims."); *Beers,* 1999 WL 325378, at \*5 ("As [the sole] defense [theory] revolves around pre-accident damage to the very item missing, [the defendant] will be unable to effectively show that the fan blade broke for reasons other than a defect. A lesser sanction is thus inappropriate as it does not cure the prejudice to [the defendant].").

In addition, a dispositive sanction will serve an important deterrent value. As the court has explained, the conduct which occurred in this case is unacceptable. A potential litigant has a duty to preserve evidence which might prove relevant to a future lawsuit. *See Howell,* 168 F.R.D. at 505; *Baliotis,* 870 F.Supp. at 1290; *accord Shamis,* 34 F.Supp.2d at 888–89; *Bass,* 929 F.Supp. at 1288. This duty can only be heightened when a potentially adverse party makes a request to preserve the evidence. *See, e.g., Hansen v. Dean Witter Reynolds Inc.,* 887 F.Supp. 669, 675–76 (S.D.N.Y.1995) (citing, *inter alia, Turner,* 142 F.R.D. at 72–73); *see also Skeete,* 1993 WL 256659, at \*4 ("[I]t is clear that a discovery request places a litigant on notice that the documents or materials sought in the request are potentially relevant to the litigation and, thus, should be preserved.") (also citing *Turner* ). Moreover, when this adverse party agrees to pay for the storage costs of this evidence, the court can fathom no legitimate reason to subsequently destroy the material.

Imposing a dispositive sanction for this type of conduct punishes the wrongdoer for the severity of its culpable conduct, and serves to put the public on notice that this type of behavior will be punished severely. As a result, the ruling should serve to discourage similar misconduct in the future.

Given these considerations, the court has decided to use its inherent power to enter an interlocutory finding of liability against Wechsler. The court does not impose this sanction lightly. It is the most

severe penalty that can be handed down. However, after considering the circumstances of this case, a finding of liability is the only sanction which can adequately punish Wechsler for the conduct which occurred here while, at the same time, sending a message to other litigants that this type of behavior will not be tolerated by the court.

As previously discussed, a request had been made to preserve the wreckage of the ATLAS so that additional tests could be run on the remains. Furthermore, the party making this request had offered to pay all of the future storage costs associated with the preservation of the vessel. In the face of this reasonable request and offer, Wechsler's representatives destroyed the yacht intentionally. They sent the remains to the crusher that day. They had no legitimate reason to do so. As Cysyk explained at his deposition, it was not going to cost Windsor–Mount Joy a dime to continue to preserve the vessel. Instead, Chubb was going to cover these costs. Thus, the only reason which the court can discern for disposing of the ship would be to conceal unfavorable evidence, especially since Cysyk had just told McLaughlin that he thought that he could reconstruct the vessel and, thus, determine the cause and origin of the fire. Furthermore, a reconstruction of the ATLAS might have been able to establish whether or not the repairs which Loller claims to have seen had in fact been made. Without the vessel, the claimants are not able to carry their burden on these issues. As a result, they have been completely prevented from establishing their claims in this lawsuit. Holding Wechsler liable for their losses is the only sanction which can adequately punish him for the misconduct which occurred here while simultaneously sending the message to other litigants that this type of conduct is completely unacceptable.[7]

**B. The Motions For Summary Judgment.**

Both Wechsler and Georgetown have moved for summary judgment. In his motion, Wechsler argues that the claims against him should be dismissed since there is no credible evidence to suggest that the fire started onboard the ATLAS as the result of a negligent act or an unseaworthy condition. Georgetown has moved for summary judgment on the counter-claims and cross-claims for negligence, breach of contract, and common law bailment that have been brought against the marina.

This court can only grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c) (2000). A fact is "material" if, under the governing law, it could effect the outcome of the case. *See, e.g., Schoonejongen v. Curtiss–Wright Corp.,* 143 F.3d 120, 129 (3d Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *North Am. Specialty Ins. Co. v. Bader,* 58 F.Supp.2d 493, 496 (D.N.J.1999) (citing same). An issue is "genuine" if a reasonable fact-finder could return a verdict in favor of the non-moving party. *See Schoonejongen,* 143 F.3d at 129 (quoting *Anderson* ); *Bader,* 58 F.Supp.2d at 496 (same). Finally, on summary judgment, the court must look at the evidence in the most favorable to the non-moving party, drawing all reasonable inferences and resolving all reasonable doubts in favor of that party. *See, e.g., Bader,* 58 F.Supp.2d at 496 (citing *Pollock v. American Tel. &*

---

7. The only reason why the court has not entered judgment against Wechsler is because, at this stage of the proceedings, the claimants have not yet submitted evidence concerning the extent of their losses. In light of this posture, the court will afford the claimants sixty days to file their submissions on this issue. Afterwards, Wechsler shall have thirty days to respond. He may submit any relevant rebuttal evidence which would be appropriate under the circumstances. In the event that the parties require additional time to prepare their filings, they may seek leave from the court to extend these deadlines.

*Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986)).

### 1. Wechsler's motion for summary judgment.

Given the nature of this court's ruling on the motions for sanctions, Wechsler's motion for summary judgment will be denied as moot. Wechsler bases his motion on the premise that "[t]he record in this case contains no evidence that any negligence on [his] part ... was the cause of the fire." However, this lack of evidence is the direct result of the decision by McLaughlin and Mountz to have the ATLAS destroyed despite the request by others to preserve the vessel's remains so that the yacht could be reconstructed. As the court has explained, disposing of the ship in the face of this request was unreasonable, especially since an offer had been made to assume all of the future storage costs associated with the continued preservation of the wreckage. In order to punish Wechsler and his representatives for their culpable conduct and to deter others from engaging in similar misconduct in the future, the court has decided to impose dispositive sanctions in this case. As a result, Wechsler's motion for summary judgment is rendered moot.

### 2. Georgetown's motion for summary judgment.

Wechsler and the Great American Insurance Company, which insured another vessel that was damaged in the fire, have brought claims against Georgetown for negligence, breach of contract, and common law bailment. The marina has moved for summary judgment on these claims. Its motion will be granted for two reasons. First, the exculpatory language in the marina's slip rental agreements releases Georgetown from any liability due to its negligence. Second, given the undisputed evidence of this case, the court cannot conclude that the two vessels in question were bailed articles. The following sections explain the court's reasoning on these points more thoroughly.

#### a. The negligence claims.

According to Wechsler and Great American, Georgetown failed to adequately protect their vessels from the risk of fire since the marina did not provide adequate fire detection, prevention and suppression systems at the docks. In this respect, the two claimants contend, Georgetown failed to exercise the proper level of care required under the circumstances.

For example, the claimants point out that Georgetown had not trained its employees in fire fighting techniques or conducted any fire drills at the marina. The claimants also note that there were no smoke detectors, heat detectors, sprinkler systems, or stand pipes at the dock. Furthermore, no one at the marina had contacted the local fire department to inspect the facility or develop a plan for fighting any fire that might occur there. In fact, it does not appear that Georgetown even employed a night watchman to patrol the facility.

According to Wechsler and Great American, all of these deficiencies violate the minimum safety requirements set forth by the National Fire Protection Association ("NFPA") in its regulations concerning the operation of marinas, boatyards, and yacht clubs. Because these regulations set forth the appropriate standard of care in this field, the claimants continue, Georgetown breached its duties to them by failing to provide a safer facility.

In response, Georgetown points to the exculpatory language of its slip rental agreement. The relevant portion of this clause provides:

> The Vessel Owner[ ] is well aware that the consideration paid to G[eorgetown] for slip rental ... is disproportionately small in comparison to the value of the Vessel ... and the Vessel Owner[ ] is well aware of the various types of risks that are involved, and associated with slip rental, handling, and other work performed on his Vessel on the premises of G[eorgetown]; therefore, it is under-

stood and agreed that all vessels and all other property of the Vessel Owner[ ] ... which may be brought onto the premises of G[eorgetown], during the term of this Slip Rental Agreement and any extension thereof, or such times as said property is held on the premises of G[eorgetown] at the sole risk of the Vessel Owner[ ] ... and that G[eorgetown], its agents, servants and employees will not be liable for any loss or damage to said property under any circumstances including[ ] but not limited to fire, theft, vandalism, water damage and any negligent acts or omissions by G[eorgetown] and its employees....

Given this language, Georgetown contends, the claimants knew that they were leasing their berths at their own risk and agreed not to hold the marina liable for any damage which their vessels might incur while moored there.

### i. The exculpatory clause does not contravene public policy.

Citing *Bisso v. Inland Waterways Corp.*, Wechsler argues this exculpatory clause should be voided on public policy grounds in order to "discourage negligence by making wrongdoers pay damages" while, at the same time, "protect[ing] those in need of goods and services from overreaching by those who have the power to drive hard bargains." 349 U.S. 85, 90–91, 75 S.Ct. 629, 99 L.Ed. 911 (1955). Wechsler, however, reads *Bisso* far too broadly. In that case, the Supreme Court refused to recognize an exculpatory clause in a contract for maritime towing services because the case law "strongly point[ed] to the existence of a judicial rule, based on public policy, invalidating contracts [which] releas[e] *towers* from all liability for their negligence." *Id.* at 90, 75 S.Ct. 629 (emphasis added). As the *Bisso* Court explained, "[t]his rule is merely a particular application to the *towage business* of a general rule long used by courts and legislatures to prevent enforcement of release-from-negligence contracts in many relationships...." *Id.* at 90–91, 75 S.Ct. 629 (emphasis added).

Given this language, *Bisso* has been interpreted as applying only to those situations involving a contract for maritime towing services. *See Royal Ins. Co. of Am. v. Southwest Marine*, 194 F.3d 1009, 1014 & n. 5 (9th Cir.1999) ("[T]he Ninth Circuit has weighed the policy considerations and concluded that, except in towing contracts, exculpatory clauses are enforceable even when they completely absolve parties from liability for negligence....") (citing *Arcwel Marine, Inc. v. Southwest Marine, Inc.*, 816 F.2d 468, 470 (9th Cir. 1987); *M/V American Queen v. San Diego Marine Const. Corp.*, 708 F.2d 1483, 1488 (9th Cir.1983)); *Morton v. Zidell Explorations, Inc.*, 695 F.2d 347, 350–51 (9th Cir. 1982) (explaining that "*Bisso* merely reaffirmed the rule for towage contracts"); *see also La Esperanza De P.R., Inc. v. Perez Y Cia. De Puerto Rico, Inc.*, 124 F.3d 10, 19 (1st Cir.1997) ("While exculpatory clauses—commonly referred to as red letter clauses—were traditionally disfavored by courts sitting in admiralty, *see ... Bisso ...*, such clauses are today routinely enforceable. Accordingly, courts today will enforce red letter clauses that are expressed clearly in contracts entered into freely by parties of equal bargaining power, provided that the clause not provide for a total absolution of liability."); *accord Edward Leasing Corp. v. Uhlig & Assocs., Inc.*, 785 F.2d 877, 888 (11th Cir.1986) ("[S]everal admiralty cases dealing with the limitation of liability clauses in boat repair contracts have distinguished *Bisso* and held that the parties to such repair contracts may validly stipulate that the repairer's liability is to be limited, but the cases have not allowed for total absolution of liability.") (cited in *La Esperanza*). Thus, contrary to Wechsler's contentions, the exculpatory clause contained in the slip rental agreement is not automatically unenforceable as a matter of public policy.

Of course, a review of these cases demonstrates that there is a split among the circuits on the extent to which these types of exculpatory clauses are enforceable.

For example, in the Ninth Circuit, "exculpatory clauses are enforceable even when they completely absolve parties from liability for negligence." *See Royal*, 194 F.3d at 1014; *see also Arcwel Marine*, 816 F.2d at 469–71 (enforcing a clause which exculpated the defendant from liability for "any loss"); *M/V American Queen*, 708 F.2d at 1488 ("[T]he parties to a repair contract may validly stipulate that the shipowner is to assume all liability for all damage occasioned by the negligence of the shipyard."). However, in the First and Eleventh Circuits, the exculpatory clause cannot provide for a "total absolution of liability." *See La Esperanza*, 124 F.3d at 10 (citing *Edward Leasing*, 785 F.2d at 888). After reviewing the case law and considering the rationale for the *Bisso* rule, the court finds the approach adopted by the Ninth Circuit to be more persuasive given the circumstances of this case.

■ All of these decisions recognize that, when two parties negotiate a contract, they generally have the ability to bargain over who should bear the risk of loss and what price properly corresponds with this allocation. *See La Esperanza*, 124 F.3d at 10 (quoting *Jig The Third Corp. v. Puritan Marine Ins. Underwriters Corp.*, 519 F.2d 171, 176 (5th Cir. 1975)); *Edward Leasing*, 785 F.2d at 888 (citing same). In this respect, the parties are able to "achiev[e] a more rational distribution of the risk [and a better determination of the appropriate corresponding price] than the law would otherwise allow." *See Jig*, 519 F.2d at 176. Consequently, when two parties of equal bargaining power freely enter into a contract, their agreement should generally be enforced even if their bargain limits one side's liability for certain acts. *See Royal*, 194 F.3d at 1014 (quoting *American Queen*, 708 F.2d at 1488); *La Esperanza*, 124 F.3d at 10 (citing *Edward Leasing*, 785 F.2d at 888).

In *Bisso*, the Supreme Court departed from this general rule in order to

discourage negligence by making wrongdoers pay damages and ... protect those in need of goods and services from being overreached by other parties who have [the] power to drive hard bargains.... [B]oth reasons apply with equal force whether tugs operate as common carriers or contract carriers. The dangers of modern machines make it all the more necessary that negligence be discouraged[, a]nd [the] increased maritime traffic of today makes it ... more important that vessels in American ports be able to obtain towage free of monopolistic compulsions.

The practical result of leaving towers wholly free to contract against all liability for their negligence is ... impossible under the rule we accept as controlling.

...

... It is one thing to permit a company to exempt itself from liability for the negligence of a licensed pilot navigating another company's vessel on that vessel's own power.... It is quite a different thing ... to permit a towing company to exempt itself by contract from all liability for its own employees' negligent towage of a vessel.

349 U.S. at 91–93, 94, 75 S.Ct. 629 (internal citations and footnotes omitted).

Thus, the Supreme Court's primary concern in *Bisso* which served as the underlying reason for the decision was the desire to protect the public from towers who, by virtue of their position in the marketplace, were able to exercise a disproportionate amount of power in the contractual relationship to the detriment of the other party who was effectively at their mercy.

As the Supreme Court explained in a related context,

common carriers cannot secure immunity from liability for their negligence by any sort of stipulation. The rule rests on broad grounds of public policy, justifying the restriction of liberty of contract because of the public ends to be achieved. The great object of the law governing common carriers was to secure the utmost care in the rendering of

a service of the highest importance to the community. A carrier who stipulates not to be bound to the exercise of care and diligence "seeks to put off the essential duties of his employment." It is recognized that the carrier and the individual customer are not on an equal footing. "The latter ... cannot afford to h[a]ggle or stand out and seek redress in the courts.... He prefers rather to accept any bill of lading, or sign any paper the carrier present[s]; often, indeed, without knowing what the one or the other contains. In most cases he has no alternative but to do this or abandon his business." For these reasons, the common carrier, in the prosecution of its business as such, is not permitted to drop its character and transmute itself by contract into a mere bailee, with right to stipulate against the consequences of its negligence.

*See Santa Fe P. & P.R. Co. v. Grant Bros. Const. Co.*, 228 U.S. 177, 184–85, 33 S.Ct. 474, 57 L.Ed. 787 (1913) (citations omitted) (quoting *New York Cent. R. Co. v. Lockwood,* 17 Wall. 357, 84 U.S. 357, 379, 21 L.Ed. 627 (1873).)

This exception, however, is a relatively narrow one. As the *Santa Fe* Court continued,

> this rule has no application when a ... company is acting outside the performance of its duty as a common carrier. In such case, it is dealing with matters involving ordinary considerations of contractual relation; those who choose to enter into engagements with it are not at a disadvantage; and its stipulations even against liability for its own neglect are not repugnant to the requirements of its public service. The rule extends no further than the reason for it. It is apparent that there may be special engagements which are not embraced within its duty as a common carrier, although their performance may incidentally involve the actual transportation of persons and things, whose carriage in

other circumstances might be within its public obligation.

> . . .

> The parties, then, were free to make their own bargain as to this transportation and the liability which should attach to it. . . . The parties were on an equal footing. The risk of loss or damage to the grading outfit or supplies from any cause, while being transported over the line of the railway company, could be assumed by one party or the other, as they saw fit. This risk was an item which naturally would enter into the calculations of the parties with respect to the rate to be charged by the railway company. We are not at liberty to revise the contract, and the question simply is whether the stipulation against liability, in view of the reduced rates, covered all losses, those which might be due to the carrier's neglect, as well as others.

*Id.* at 186–89, 33 S.Ct. 474.

■ In this case, Georgetown was not exercising the type of monopolistic power that the *Bisso* and *Santa Fe* courts considered offensive. Neither Wechsler nor the individual who was insured by Great American were at the marina's mercy. Instead, these two claimants were free to accept or reject the terms of Georgetown's slip rental agreement. If certain provisions of the contract were not to their liking, then Wechsler and his counterpart could have attempted to negotiate these matters with Georgetown. In the alternative, they could have simply moored their vessels at a different marina with a more favorable rental agreement. Because neither one of these two claimants were at the mercy of Georgetown, the exculpatory clause contained within the slip rental agreement should be given full effect in accordance with the governing law. *See Hall–Scott Motor Car Co. v. Universal Ins. Co.*, 122 F.2d 531, 537 (9th Cir.1941) ("[T]he right of private persons to contract as they please will be sustained by the federal courts" especially when one side

"[i]s at liberty to select any vendor of engines to replace the old engine, and to employ the seller or anyone else to install it."); *Newport News Shipbuilding & Dry Dock Co. v. United States,* 34 F.2d 100, 106 (4th Cir.1929) ("[A] contract whereby [one party] agree[s] to assume all liability for damage to its vessel while at the yard would be valid.") (cited in *Hall–Scott* ); *cf. Johnson v. West Suburban Bank,* 225 F.3d 366, 377 (3d Cir.2000) ("Only those who consent to credit agreements with binding arbitration clauses are forced to abandon this procedural avenue; those who do not consent to arbitration in their contracts have the full selection of forums.").

### ii. The exculpatory clause is not ambiguous.

Next, Wechsler and Great American argue that the exculpatory clause should not be enforced because its language is "not clear" and the clause itself is "riddled with ambiguity." The court disagrees. The language contained within the contractual provision is unambiguous. Even when this language is strictly construed, it still absolves Georgetown from liability for any negligent acts or omissions.

▮▮▮ In admiralty cases, the courts traditionally construe the language of exculpatory clauses strictly against the drafter. *See Edward Leasing,* 785 F.2d at 889. When the contractual language is clear and unequivocal and plainly indicates the intentions of the parties, it should be given its full effect. *See id.* (citing, *inter alia, Jig,* 519 F.2d at 171).

Here, the court finds the exculpatory language of the slip rental agreement to be clear and unambiguous. The clause plainly states that the owner of a vessel moored at the marina is:

1. "well aware that the consideration paid to G[eorgetown] for slip rental ... is disproportionately small in comparison to the value of the Vessel;" and

2. "well aware of the various types of risks that are involved, and associated with slip rental...."

Therefore, the agreement provides, "it is understood and agreed that all vessels and all other property of the Vessel Owner[ ] ... which may be brought onto the premises of G[eorgetown], during the term of this Slip Rental Agreement ... or such times as said property is held on the premises of G[eorgetown] at the sole risk of the Vessel Owner[ ]...." In other words, "G[eorgetown], its agents, servants and employees will not be liable for any loss or damage to said property under any circumstances including[ ] but not limited to fire, theft, vandalism, water damage and any negligent acts or omissions by G[eorgetown] and its employees...."

Thus, Wechsler, and the individual who was insured by Great American, knew that they were storing their boats at Georgetown at their own risk. They also agreed that Georgetown would not be held liable for "any loss or damage to [their] property" which included "fire" and "any negligent acts or omissions" by Georgetown or its employees.

Wechsler claims that the use of the term "premises" in the agreement renders the clause ambiguous since this word generally refers to "land with its appurtenances and structures thereon." *See Black's Law Dictionary* 1180 (6th ed.1991). However, it is absurd to suggest the premises of the marina do not include its docks where the vessels are berthed. The court, therefore, rejects this argument.

Great American makes an equally unavailing argument when it claims that the term "property" does not refer to the vessel which is kept at the marina. The contractual language clearly states that "all vessels and all other property" of the vessel owner is the subject of the agreement. Thus, the clause covers not only the vessel which is moored at the dock but also any other vessel which the individual might own and berth at the same place. Likewise, the clause covers *any* property

onboard these vessels or *any* property that might be brought onboard these vessels. The language could not be any more clear or unmistakable.

In addition, while Great American contends that the agreement does not make it clear that the vessels and other property were being stored at the marina at the owner's sole risk, the court is not persuaded by this argument. Admittedly, the language of the clause is hardly a model of grammatical perfection. Nevertheless, the meaning of the final phrase of the exculpatory clause is unmistakable. Specifically, the claimants agreed that "G[eorgetown], its agents, servants and employees will not be liable for any loss or damage to said property under any circumstances including[ ] but not limited to fire, theft, vandalism, water damage and any negligent acts or omissions by G[eorgetown] and its employees...." This language is unambiguous. Even when it is strictly construed, it still releases Georgetown from liability for any damages or losses which result from negligent acts or omissions regardless of whether the acts or omissions were committed by marina itself or any of its employees.

iii. Although Georgetown cannot exculpate itself for gross negligence or reckless behavior, these claims have not been brought by Wechsler or Great American.

 Wechsler and Great American finally contend that, to the extent that the exculpatory clause of the slip rental agreement releases Georgetown from claims of gross negligence or reckless, this provision cannot be enforced. All of the circuits which have considered this issue have concluded that "a party to a maritime contract should not be permitted to shield itself contractually from gross negligence ... and, *a fortiori*, for intentional misconduct." *See Royal*, 194 F.3d at 1016; *La Esperanza*, 124 F.3d at 19 ("A red letter clause ... may not limit liability on a marine contract for gross negligence because 'harm willfully inflicted or caused by gross or wanton

negligence operates to invalidate an exemption from liability.'") (quoting *Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401, 411 (5th Cir.1982);) *see also Martin Marietta Corp. v. International Telecomm. Satellite Org.*, 991 F.2d 94, 99–100 (4th Cir.1992) (relying on, *inter alia*, *State Highway Admin. v. Greiner Eng'g Sciences*, 83 Md.App. 621, 577 A.2d 363, 372 (1990)). Because reckless misconduct falls between gross negligence and intentional wrongdoing, it also cannot be the subject of a valid release. *See, e.g., Boucher v. Riner*, 68 Md.App. 539, 514 A.2d 485, 488 (1986) ("A waiver of a right to sue ... is ineffective to shift the risk of a party's own willful, wanton, reckless, or gross conduct.") (cited in *Martin Marietta*).

However, neither Wechsler nor Great American have brought claims of gross negligence or recklessness against Georgetown. Instead, these two claimants have alleged that Georgetown acted negligently in maintaining its premises. In particular, in his counter-claims, Wechsler contends that Georgetown "breach[ed] ... its obligation to provide safe and adequate security and fire prevention, detection, suppression and extinguishing facilities...." Wechsler also alleges that Georgetown breached its duty to "adequately protect vessels from foreseeable risks of .. fire ... and to otherwise exercise due care under the circumstances." Great American has leveled similar allegations in its cross-claims, contending that Georgetown breached its "common law duty to exercise ordinary care to protect to the boats [which] it stores from fires" because the marina did not take "reasonable precautions to prevent and control fires and to arrest the progress of a fire after it [had] started." In their pleadings, both Wechsler and Great American allege that, as a result or consequence of Georgetown's *negligence*, they have incurred substantial losses.

Thus, contrary to their arguments in opposition to Georgetown's motion for

summary judgment, neither Wechsler nor Great American have asserted claims of gross negligence or recklessness against Georgetown. Furthermore, during discovery, neither one of these two claimants sought leave to assert these types of claims against the marina. Nor did these parties move to amend their pleadings when Georgetown pointed out this deficiency at the close of briefing on summary judgment. If fact, as of the date of this ruling, Wechsler and Great American still have yet to request leave to assert claims of gross negligence and recklessness.[8]

Therefore, the court will grant summary judgment in favor of Georgetown on the claims of negligence which have been brought by Wechsler and Great American.

### b. The bailment claims.

■ A bailment exists when an owner delivers his goods to another person for a specific reason and that person accepts those goods with the express or implied understanding that they will be returned to the owner in at least the same condition as they were delivered after the reason for their delivery has been fulfilled. *See, e.g., Thyssen Steel Co. v. M/V Kavo Yerakas,* 50 F.3d 1349, 1354–55 (5th Cir. 1995); *Goudy & Stevens, Inc. v. Cable Marine, Inc.,* 924 F.2d 16, 18 (1st Cir. 1991). If the owner can establish that the goods were delivered in a good condition but returned in a damaged condition or not returned at all, then a rebuttable presumption of negligence arises against the party who accepted the goods. *See, e.g., Richmond Sand & Gravel Corp. v. Tidewater Constr. Corp.,* 170 F.2d 392, 393 (4th Cir. 1948) ("[A] *prima facie* presumption of negligence on the part of the bailee arises from the bailor's proof that the bailed article was delivered in good condition and was returned damaged or not returned at all.").

■ In admiralty, a bailment most often occurs when two parties enter into an agreement to either store or repair a boat. *See Snyder v. Four Winds Sailboat Centre, Ltd.,* 701 F.2d 251, 252–53 (2d Cir. 1983); *see also Goudy & Stevens,* 924 F.2d at 18 (citing *Buntin v. Fletchas,* 257 F.2d 512, 513 (5th Cir.1958)). In order to demonstrate the existence of a bailment in these instances, the owner of the vessel show that "the delivery to the bailee is complete and he has exclusive right to possession of the bailed property, even as against the owner." *See T.N.T. Marine Service, Inc. v. Weaver Shipyards & Dry*

---

8. Nor would the court be inclined to grant such a motion now given the significant amount of time which has passed in the interim. *See Pallottino v. City of Rio Rancho,* 31 F.3d 1023, 1027 (10th Cir.1994) ("Much of the value of summary judgment procedure ... would be dissipated if a party were free to rely on one theory in an attempt to defeat a motion for summary judgment and then, should that theory fail, come back along thereafter and fight on the basis of some other theory.") (*Freeman v. Continental Gin Co.,* 381 F.2d 459, 469–70 (5th Cir.1967)).

Here, Wechsler and Great American have known about a potential deficiency in their counter-claims and cross-claims for over ten months. They however, have yet to seek leave to amend to cure this problem. Given the circumstances, any subsequent motion to amend would be untimely in addition to being unfairly prejudicial to Georgetown. *See Cureton v. National Collegiate Athletic Ass'n,* 2000 WL 388722, at *3 (E.D.Pa. Apr.14, 2000) (denying a motion to amend which was filed three years after the initiation of the lawsuit since it would be unfair to require the defendants to litigate the case "one claim at a time" especially since the plaintiffs had long been aware of the factual basis for their proposed amendment); *see also Barclays Bank P.C. v. 865 Centennial Ave. Associates Ltd. Partnership,* 26 F.Supp.2d 712, 723 (D.N.J. 1998) ("[A] court may deny a motion to amend where the motion was filed after the court granted summary judgment dismissing the complaint and the party seeking to amend has no reasonable justification for the delay."); *DRR, L.L.C. v. Sears, Roebuck and Co.,* 171 F.R.D. 162, 167–68 (D.Del.1997) (finding undue delay where the plaintiff had waited two years to amend even though it "knew the scope of its claim from the very inception of this litigation" especially since the party had "offer[ed] no new evidence in support of its motion to amend ... [or] any explanation for its failure to assert [the new theory] theory before summary judgment was entered against it").

*Docks, Inc.,* 702 F.2d 585, 588 (5th Cir. 1983) (citing *Continental Ins. Co. v. Washeon Corp.,* 524 F.Supp. 34, 37 (E.D.Mo. 1981)); *accord Snyder,* 701 F.2d at 252 (requiring "exclusive custody of the boat").

As these and other decisions make clear, there is a distinction between an agreement to place a boat in dry dock for storage or repairs which is generally considered to be a bailment and an agreement to lease a slip at a marina which is not. *See Security Nat'l Ins. Co. v. Sequoyah Marina, Inc.,* 246 F.2d 830, 833 (10th Cir.1957) (NO. 5530) ("[The defendant] was not legally in charge of the boat. It simply rented docking space to [the plaintiff] at its private dock. Their relationship was that of lessor and lessee, not bailor and bailee."); *Marino v. Gagliano,* 50 Misc.2d 499, 270 N.Y.S.2d 934, 936–37 (N.Y.Sup.Ct. 1966) (finding no bailment but, instead, only the privilege to moor one's sailboat at a slip) (cited in *Snyder,* 701 F.2d at 252–53); *see also Washeon,* 524 F.Supp. at 37 ("[The plaintiff] had unrestricted access to the boat. [The d]efendant did not have a possessory interest in the boat. The evidence established a lessor-lessee relationship rather than a bailment situation.").

■ Here, Wechsler and Great American attempt to cast their contracts with Georgetown as storage agreements instead of slip rental agreements. The court is not persuaded by their arguments.

While Wechsler contends that "[i]t was [his] intent to leave the ATLAS in the exclusive care of Georgetown ... while the [vessel] was in the process of being sold," it is undisputed that Wechsler twice visited the yacht while he was living in Florida. It is also undisputed that the ship was left unlocked so that Wechsler's broker could show the vessel to interested buyers. Thus, contrary to Wechsler's contentions, the ATLAS was *not* in Georgetown's exclusive control. *Cf. Washeon,* 524 F.Supp. at 37, 36 (finding no bailment because the plaintiff had "an unrestricted right and access to the use of the boat"). Even though Wechsler may not have been exer-

cising his right of access on a regular basis, he still retained it. Moreover, Wechsler's broker also had this right. Given the undisputed evidence, the court cannot conclude that the ATLAS was a bailed article.

The individual who was insured by Great American had similar access to his boat. While it does appear that this person was mooring his vessel at Georgetown for the winter, his agreement with the marina only permitted its employees to board the vessel for limited purposes—primarily to adjust any lines or re-tie any covers that might come loose. Pursuant to the express language of the agreement, these inspections and adjustments would only occur "as necessary." In addition, the agreement specifically provided that the owner of the vessel would be responsible for, *inter alia,* polishing and greasing the chrome for winter, checking the anti-freeze and all other machinery as necessary, making a general engine room check, changing the oil as well as the oil and fuel filters, and checking the batteries on a monthly basis. Given the access which this individual was afforded to his vessel and the responsibilities he voluntarily assumed for its upkeep, the court cannot conclude that the boat was a bailed article either.

Therefore, the court will grant summary judgment in favor of Georgetown on the common law bailment claims which have been brought against the marina.

## V. CONCLUSION.

When the record is viewed as a whole, the court has concluded that the ATLAS was destroyed in order to prevent the claimants from conducting any further inspection of the vessel. Because the disposal of the wreckage has substantially prejudiced the claimants by preventing them from establishing their claims, the court has decided that a dispositive sanction is warrant. While harsh, this type of sanction is necessary so that Wechsler and

his representatives will be punished for their culpable conduct. A dispositive sanction is also warranted in order to deter others from engaging in similar misconduct in the future. Because the court has imposed dispositive sanctions against Wechsler, his motion for summary judgment will be denied as moot. Finally, the court will grant Georgetown's motion for summary because the exculpatory language contained within its slip rental agreement absolves the marina for any liability due to its negligence. In addition, given the unrestricted access which was afforded to the two vessels in question, the court cannot conclude that they were bailed articles. An order to this effect will be issued in conjunction with this opinion.